Per Curiam :
This patent case comes before the court on the merits on defendant’s motion pursuant to Buies 62 and 66 that the court adopt the opinion, findings of fact and recommended conclusions of law filed by Trial Commissioner Donald E. Lane on April 23,1964. On March 2, 1965, plaintiffs filed a notice, signed by the attorneys for defendant, agreeing to file no exceptions or brief and present no oral argument with respect to any of these cases covered by Trial Commissioner Lane’s report of April 23,1964, with each party to bear its own costs. Upon consideration thereof, and without oral argument, since the court is in agreement with the opinion, findings of fact and recommended conclusion of law of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. It is, therefore, concluded that claims 1-22, 33 and 34 of U.S. Letters Patent 2,673,556 and claims 1, 2, 3, 4, 5, 8, 9, 12, 21, 24, 25, 36, 38, 41, 43, 45, 46, 47, 48, 49, 51, 54, 55, 56, 61, 62, 63, 64, 65, 67 and 71 of U.S. Letters Patent 2,435,902, all of the claims here in suit, are invalid and not infringed and the petitions as to these claims are dismissed.
OPINION OP COMMISSIONEE
This case involves eight patent suits filed in accordance with the provisions of 28 U.S.C. § 1498 (1958, Supp. IV). It is found that there is no infringement of any of the claims of the two patents in suit, and that neither of the patents is valid.
*832 Plaintiffs here seek to recover reasonable and entire compensation for unauthorized use of the subject matter defined by several claims of U.S. Letters Patents Nos. 2,435,902, hereinafter referred to as the '902 patent, and 2,673,556, hereinafter referred to as the '556 patent. The '902 patent issued to Ferdinando C. Reggio, one of the plaintiffs here, on an alleged divisional application filed June 28, 1947. The parent application was filed February 3, 1939. The '556 patent was issued to Reggio on an alleged divisional application filed October 13, 1952, the parent application having been filed November 4, 1943. The parties plaintiff in addition to Reggio are Pratt and Whitney Company, Inc., a Delaware corporation with a place of business in West Hartford, Connecticut, and Chandler-Evans Corp., a Delaware Corporation also with a place of business in West Hartford, Connecticut. Chandler-Evans Corp. is a wholly owned subsidiary of Pratt and Whitney Co. Both Pratt and Whitney and Chandler-Evans are successors in interest of limited patent rights in the two patents in suit which rights were transferred in a license agreement by Reggio to the Niles-Bement-Pond Corporation. Reggio, a resident of Norwalk, Conn., is the holder of the legal title to both patents. The relationship of each of the parties to each other and to each of the eight suits is set forth in detail in findings 1 and 2. The right of certain plaintiffs to remain in some of these suits was discussed by this court in Pratt and Whitney Company, Inc., et al. v. United States, 139 Ct. Cl. 540, 153 F. Supp. 409 (1957).
Plaintiffs have charged that Bendix model TJ-A3 fuel control has infringed 24 claims of the '556 patent and have charged that the unlicensed Niles-Bement-Pond and Pierce VS-2 fuel controls, the Bendix AJ-A2 fuel control, the Hamilton Standard JFC-25 fuel control, and the General Electric MFC-2 and IEC controls have infringed various of 31 claims of the '902 patent. The parties agreed to a separation of issues for trial. The questions of infringement and validity of selected patent claims are now before the court.
Both of the patents in suit relate to fuel metering systems designed particularly for use with aircraft engines. The *833 patented fuel controls automatically control the fuel-air ratio of the engine combustible mixture as engine operating conditions change. The patent disclosures and patent claims in suit are described in detail in the accompanying findings of fact. The several issues of law involved are discussed in the following comments.
As a principal defense to liability under either the '902 or '556 patents in suit, defendant has urged that none of the accused controls, the TJ-A3, AJ-A2, VS-2, JFC-25, MFC-2, and IEC contain the combinations of elements defined in the claims of the patents in suit and that as a result there can be no infringement. Plaintiffs have alleged that the accused controls are equivalent to the constructions defined by selected claims of the patents in suit and that there is consequent infringement.
A patentee, particularly of a combination invention, is entitled to a range of equivalents for his invention as recited in the claims. The purpose of this allowance was described by Judge Learned Hand as “* * * to temper unsparing logic and prevent an infringer from stealing the benefit of the invention.” Royal Typewriter Co. v. Remington Rand, Inc., 168 F. 2d 691, 692, 77 U.S.P.Q. 517-8 (2d Cir. 1948). In order to avail himself of the benefits of this doctrine, the owner of the patent rights must show that the accused structure performs substantially the same function in substantially the same way to obtain substantially the same result as does the invention defined in the claims. Sanitary Refrigerator Company v. Winters, 280 U.S. 30, 42 (1929).
Since there are obvious differences in the structure and function of the accused gas turbine controls and the fuel controls defined in the claims of the patents in suit, it is necessary to determine whether plaintiffs have shown sufficient identity of structure, function, and result between the accused controls and the controls defined in the patent claims in suit to make out a case of infringement.
Both the '902 and '556 patents disclose fuel controls used in the operation of internal combustion engines, principally aircraft engines. The evidence shows that these controls were designed for and can be used only in internal combustion engines of the piston type. Thus the claims of these two *834 patents must be construed to define only combinations of elements used on piston type engines. All of the fuel controls accused to infringe the claims of the two patents in suit are designed for and work effectively only on gas turbine engines, which differ substantially in structure and operation from piston type engines. Likewise the fuel controls of gas turbine engines are basically and structurally different and operate in different manners than do the fuel controls described in either the '556 or '902 patents in suit. Under these circumstances there can be no infringement of any of the claims in suit of either the '556 patent or the '902 patent by any of the several accused gas turbine controls. It would constitute an unwarranted expansion of the doctrine of equivalents to hold that these dissimilar gas turbine fuel controls are encompassed by any of the claims relied upon by plaintiffs.
The result here reached regarding the question of infringement finds support for an additional reason. The two Neggio patents '556 and '902 were issued in a very crowded field in which numerous patents relating to subject matter similar to that contained in the two patents in suit have issued. In view of the crowded condition of the art, the claims in suit must be narrowly construed in order to be distinguished at all over the prior art, and it is well settled that the range of equivalents which can be accorded to an invention is dependent on the degree of the invention. See Gamble-Skogmo, Inc. v. Paul E. Hawkinson Co., 98 F. 2d 37, 41-2 (8th Cir. 1938). While the claims in suit must be given a very limited construction, it would be only with the broadest interpretation that they could possibly be found to read upon the accused gas turbine fuel controls, all of which contain elements and combinations of elements which as previously noted differ widely from those described in either the '556 or '902 patents. Thus even if it were possible to read the words of the claims of the '556 or '902 patents upon the accused controls there would be no infringement because of the substantial differences between the patented controls and the accused gas turbine fuel controls. See also Graver Tank and Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608-9 (1949).
*835 Defendant has as an additional defense contended that the '556 and '902 patents contain claims which are directed to subject matter previously claimed in the patentee Eeggio’s earlier issued patent 2,378,036, hereinafter referred to as the '036 patent, and that the two patents in suit are thus invalid because of double patenting. The preliminary question in establishing double patenting is ascertaining whether the language of the respective patent claims has substantially the same import. The courts have held that to have double patenting it was necessary that the claims of the patents cross-read, that is that not only must the practice of the first patent be an infringement of the second but the practice of the second must be an infringement of the first. See Preformed Line Products Company v. The Fanner Manufacturing Company, 140 U.S.P.Q. 500 (6th Cir. 1964). As is noted in the accompanying findings of fact, a number of the Eeggio '556 patent claims closely correspond with claims contained in the earlier issued '036 patent. For example claim 2 of the '556 patent and claim 14 of the '036 patent do not vary in any material respect, although the wording varies slightly. Each of these two claims in effect defines the same elements and combinations of elements. As a result, the '556 patent constitutes an unlawful attempt to extend the monopoly defined by the '036 patent claims and is void. This accords with the decision of this court in Davis Airfoils, Inc. v. United States, 129 Ct. Cl. 514, 517, 124 F. Supp. 350 (1954), cert. denied, 348 U.S. 950 (1954), in which it was stated that:
Where an inventor subsequently receives a second patent in which the monopoly expressed in the claim or claims is the same as that covered by the first patent, even though the phraseology of the claims differs therefrom, the 17-year period of monopoly is extended, and the second patent is therefore void because of double patenting, the inventor’s rights having been exhausted by the first patent.
Plaintiffs have contended that the defense of double patenting is inapplicable as a defense to the '556 patent because of an alleged strong presumption that is raised in view of the fact the Patent Office issued both the '036 and '556 patents, that the two patents were granted for distinct pat *836 entable subject matter. Plaintiffs have also contended that defendant failed to prove double patenting by not comparing tlie monopolies defined by the claims of the two patents. As for the latter contention, the facts are to the contrary. Defendants during the trial showed that the claims can be cross-read to the extent that a finding of double patenting is warranted. The alleged presumption that patents were granted for distinguishable subject matter is overcome by the fact there is no indication the '036 patent was before the examiner until after the '556 claims had been allowed, after which time the patentee Peggio called the '036 patent to the attention of the examiner.
In view of the finding that the '556 claims are invalid due to double patenting, it is not necessary to consider defendant’s charge that the subject matter of the '556 patent had been dedicated to the public.
With regard to the '902 patent, there are indications that the monopolies defined by some of the claims of this patent and some of the claims of the '036 patent are coextensive, particularly is this true of claim 7 of the '902 patent which is not in issue and claim 7 of the '036 patent. The evidence of double patenting involving other claims of the '036 and '556 patents is not sufficient to warrant holding the '902 patent void for double patenting, and we conclude that the question should not be resolved by referring to a claim not in issue. See Pyle Nat. Co. et al. v. Lewin, 92 F. 2d 628 (7th Cir. 1937), where it was held that even though claims of the patent not there in issue represented an extension of the monopoly defined by previously issued claims, that the patent was not invalid for double patenting.
Defendant has raised the defense of late claiming. The facts show that the accused TJ-A3 fuel control was in public use and on sale in the United States as early as 1946. The '556 patent application which is an alleged divisional of patent application Ser. No. 508,897 filed November 4, 1943, and which allegedly contains claims which define a combination or combinations of elements used in the accused TJ-A3 control, was not filed in the U.S. Patent Office until October 13, 1952, some six years after the TJ-A3 control was in public use and on sale. Plaintiffs contend that not *837 withstanding this long delay in the filing of the '556 application and the claims contained therein, they are not barred as a result of late claiming from claiming subject matter relating to the TJ-A3 control because Eeggio had been claiming in the parent application Ser. No. 508,897 the subject matter of the '556 patent long before the advent of the TJ-A3. This argument is not supported by the facts. Eeggio presented no claim to the Patent Office during the prosecution of the parent application Ser. No. 508,897 which could possibly cover the TJ-A3 until claim 72 was presented in September 1951, at least 5 years after the TJ-A3 had been in public use and on sale. During this delay in the claiming of the subject matter of the present '556 patent claims, defendant obtained intervening rights due to the public use and sale of the accused TJ-A3 control which preclude liability to plaintiffs under any patent claim asserted under the '556 patent. Eeggio’s untimely presentment of the subject matter of the '556 patent claims either invalidates these claims in accordance with the late claiming doctrine announced in Muncie Gear Works, Inc. et. al. v. Outboard Marine Manufacturing Co., et al., 315 U.S. 759 (1942), or they must be narrowly construed to avoid infringement by the TJ-A3 control to accord with the holding of the Supreme Court in Railway Company v. Sayles, 97 U.S. 554, 563 (1878), in which it was stated:
* * * Courts should regard with jealousy and disfavor any attempts to enlarge the scope of an application once filed, or of a patent once granted, the effect of which would be to enable the patentee to appropriate other inventions made prior to such alteration, or to appropriate that which has, in the meantime, gone into public use.
It was stated more recently in Tropic-Aire v. Sears Roebuck and Co., 44 F. 2d 580, 593 (8th Cir. 1930) :
* * * The public, therefore, was using the Modine heater in automobiles before claim 7 of Caesar was filed. The public would appear, therefore, to have some intervening rights which should not be appropriated by a patentee.
It is further rioted that there was an expiration of about 8 years between the filing date of the parent application Ser. *838 No. 508,897 and the filing date of the alleged divisional '556 application containing claims relating to subject matter not in the original claims or in any presented to the Patent Office until, as noted above, claim 72 was presented in September 1951. In the case of Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 466 (1924), the Supreme Court was faced with a similar situation wherein the patent owner was relying upon claims submitted in a divisional application over 8 years after the filing of the original application. The Supreme Court stated:
* * * the long delay of Kane and his assignee in coming to the point tends strongly to confirm the view that the final determination to do so was an exigent afterthought, rather than a logical development of the original application. We have no hesitation in saying that the delay was unreasonable, and, under the circumstances shown by the record, constitutes laches, by which the petitioner lost whatever rights it might otherwise have been entitled to.
There is no satisfactory explanation of record for Reggio’s long delay in presenting claims to the Patent Office directed to the subject matter here asserted to be protected by the '556 patent, and this unwarranted delay supports following the decision in the Webster case and finding the claims invalid due to laches.
In challenging the validity of the two patents relied upon here by plaintiffs, defendant has produced numerous prior publications and patents which it contends demonstrate that the subject matter of these patents was unpatentable at the time Reggio sought patent protection in the Patent Office. The more important prior art references relied on by defendant are discussed in detail in the accompanying findings.
The patent statutes provide:
35 U.S.C. § 102. Conditions for patentability; novelty and loss of right to patent
A person shall be entitled to a patent unless—
(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or
(b) the invention was patented or described in a printed publication in this or a foreign country or in *839 public use or ou sale in this country, more than one year prior to the date of the application for patent in the United States, or
He ❖ H« ❖ ❖
(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or
He He ❖ ❖
35 U.S.C. § 103. Conditions for patentability; non-obvious subject matter
A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.
Of the 11 prior art references (finding 24) relied upon to show invalidity of the '556 patent claims, the Aero Digest article dated April 1940, the Wunsch patent 2,341,257, 1944, the Chandler patent 2,224,472, 1940, and the Mock patents 2,414,322, 1947, and 2,447,261, 1948, are considered most pertinent.
The Aero Digest article, a prior publication discussed in finding 33, describes the Bendix-Stromberg injection carburetor which is a structural and functional equivalent of the fuel control described and claimed in the '556 patent. This prior publication fully anticipates all of the claims of the '556 patent in suit and renders them invalid in accordance with the provisions of paragraphs (a) and (b) of section 102 of the statute quoted above. Furthermore the Bendix-Stromberg carburetor was in public use and on sale prior to February 1939, over 4 years prior to the filing of the parent application Ser. No. 508,897 of the '556 application, the earliest date upon which plaintiffs rely. Consequently the '556 patent is invalid since the patentee Reggio failed to meet the requirements of paragraph (b) of section 102 of the patent statute. The Mock patent 2,447,261 discloses a fuel control *840 possessing all of the elements of the Bendix-Stroniberg carburetor which are also common to the '556 control and is thus equally applicable as an invalidating prior art reference.
The Wunsch patent which is discussed in findings 37, 90, and 91 discloses a fuel control possessing structural parts and elements which closely correspond to the provisions of the '556 claims in suit. As is noted in findings 37 and 91, plaintiffs’ witnesses, Mr. Chandler and Mr. Prentiss, the latter plaintiff Chandler-Evans Corp.’s patent counsel, in correspondence written prior to the present suits, expressed the opinion that a number of the '556 and '902 patent claims in suit were anticipated by the Wunsch patent and that the Wunsch patent had a narrowing effect upon all of the '556 and '902 patent claims. These opinions, previously made by Chandler and Prentiss but later modified at the trial, are not binding upon plaintiffs here, and do not estop them from asserting the validity of the claims of the two patents in suit. It is noteworthy, however, that officials of certain plaintiffs at least at one time did not regard a number of the claims, upon which they now rely, as being valid, and thought that all of the claims of both patents had to be narrowly construed. In view of the close similarity of the subject matter of the Wunsch patent and the '556 patent claims, it is found that the '556 patent claims in suit did not define a patentable advancement in the art.
The Chandler patent discussed in findings 36 and 92 discloses a pressure fed carburetor which fully meets a number of the '556 patent claims in suit, and, with the addition of a flyball governor thereto in a manner which would have been obvious to one skilled in the art in accordance with the provisions of section 103 of the patent statute quoted above, all of the '556 patent claims in suit were anticipated by the Chandler patent so modified.
The Mock patent 2,414,322, which was cited by the patent examiner during, the prosecution of the '556 patent application, also discloses a fuel control which is substantially identical structurally and operationally to the '556 control. Beggio avoided this prior patent in the Patent Office by contending that his control possessed a governor which operated the fuel-air ratio control valve of the '556 control *841 as a function of engine speed. It is noted that tbe Mock control includes a fuel-air ratio control valve moved as a function of engine speed in a manner similar to that of the '556 control and there was thus no basis for distinguishing the '556 control on the grounds that it, unlike the prior art, contained a governor.
Of the prior art references cited by defendant, plaintiffs specifically challenge the applicability of the Bendix-Stromberg carburetor and the Mock patent 2,414,322. It is argued by plaintiffs that the '556 fuel metering control is distinguishable from either the Mock control or the Bendix-Stromberg carburetor because the enrichment valves used in the latter two devices respond solely to engine speed irrespective of changes in altitude or air pressure. This difference in the structure of the Mock and Bendix-Stromberg controls and in the '556 control is not patentably significant since the enrichment valves of both are controlled in a manner similar and equivalent to the manner in which the '556 valve is controlled.
The most pertinent of the prior art references relied upon by defendant to show the invalidity of the '902 patent are the Beggio patent 2,318,036, the Pescara patent 2,292,288, and the Wunsch and Chandler patents mentioned above. All of these prior patents are discussed in detail in the accompanying findings. These prior patents disclose all of the elements and combinations of elements defined by the '902 patent claims in suit. For this reason the '902 claims do not meet the requisites for patentability specified in section 102, paragraphs (a), (b), or (e) quoted above.
Plaintiffs in urging the inapplicability of the prior art references relied upon by defendant have made a brief analysis of each of these references and contend that they do not disclose the essential features of the '902 patent. Plaintiffs in reaching this conclusion relied on their four paragraph characterization (finding 42) of the alleged invention described in the '902 patent, and did not compare the actual combinations of elements recited by the various claims of the '902 patent in suit with the prior art cited by defendants. Assuming while not conceding that the prior art does not meet the combination of elements recited in plaintiff’s four *842 paragraph characterization of the alleged invention, of the '902 patent, this is immaterial in making a determination of the validity of the '902 patent claims. It is only the claims themselves which can be considered in determining whether the requirements specified in the patent statutes have been met. See Paper Bag Patent Case, 210 U.S. 405, 419 (1908). Courts have long held that a claim is not “like a nose of wax which may be turned and twisted in any direction” to make it include something not expressly recited. See White v. Dunbar, 119 U.S. 47, 51 (1886). See also Kuhne Identification Systems v. United States, 82 Ct. Cl. 237, 258 (1936). The elements of the '902 patent claims in suit when individually compared with the prior art do not define a patentable advancement over this art and are found invalid.
A number of the claims in suit are vague, ambiguous, and indefinite and fail to meet the requirements of 35 U.S.C. § 112 which provides:
‡ * *
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
Hi % H* ❖ ❖
The purpose of the above section is to apprise the public of the limits of the invention so that others may use that which is not protected. Reggio in many instances has left in doubt what he regarded as the boundaries of his inventions and just what he regarded as his inventions. This doubt has made it impossible for the public to ascertain the limits of his inventions, if any.
Defendant has urged that because plaintiffs Pratt and Whitney Company, Inc. and Chandler-Evans Corp. are not the owners of the patents in suit they do not have sufficient interest in the patents to maintain these suits. This matter has been previously resolved by this court in Pratt and Whitney Company, Inc., et al. v. United States, 139 Ct. Cl. 540, 153 F. Supp. 409 (1957) and need not be given further consideration here.
Defendant has also contended that it received an implied license to use the subject matter of the two patents here in suit because certain plaintiffs obtained these patents as a *843 result of knowledge obtained through a confidential relationship with defendant, and that plaintiffs are therefore prohibited from asserting a claim against defendant. The evidence does not substantiate this contention.
It is recommended that the court find that none of the claims relied upon by plaintiffs are infringed by any of the accused fuel controls and that the Reggio patents 2,435,902 and 2,673,556 are invalid.
FINDINGS OF FACT
1. These are eight suits brought under the provisions of 28 U.S.C., § 1498. Plaintiffs seek to recover reasonable and entire compensation for unauthorized use and manufacture by or for the United States of inventions disclosed in and covered by United States Letters Patent 2,435,902, hereinafter referred to as '902, issued to plaintiff Reggio on February 10, 1948, entitled “Fuel Metering Device,” and United States Letters Patent 2,673,556, hereinafter referred to as '556, issued to plaintiff Reggio on March 30, 1954, entitled “Engine Fuel Control.” The essentials of each of the suits are set forth as follows:
(a) Petition 81-57 was filed by Pratt and Whitney on February 20, 1957, for infringement of Patent '902 from January 10, 1955, the date of Pratt & Whitney’s ownership of its exclusive right to make, use, and sell the device claimed in the aircraft and guided missile fields, to the date of filing of the petition. The petition specified fuel control model VS-2 manufactured by the Pierce Governor Company, Inc., of Anderson, Indiana. By motion Pratt and Whitney requested that Reggio, who holds a reversionary interest in the patent, be notified to appear as a plaintiff. By the opinion of the court in Pratt and Whitney Company et al. v. United States, 139 Ct. Cl. 540, 153 F. Supp. 409, 114 U.S.P.Q. 246 (1957), Reggio was “required to appear and present any claim he may have in the subject matter of the litigation.” On October 23,1957, Reggio joined this suit as a voluntary plaintiff.
(b) Petition 82-57 was filed by Pratt and Whitney on February 20, 1957, for infringement of both patents from the date of Pratt and Whitney’s ownership of its exclusive right *844 to make, use, and sell in the aircraft and guided missile fields to the date of filing of the petition. This petition initially specified fuel control models AJ-A2 and TJ-A3 but was later amended to specify model JFC-12 for the period January 10, 1955, to August 14, 1958, with respect to both the '902 patent and the '556 patent. In this case, too, request was made that Reggio be notified to appear, and the court issued the same order as in 81-57. On October 23, 1957, Reggio joined as a voluntary plaintiff.
(c) Petition 458-57 was filed by Reggio on October 2,1957, for infringement of the '902 patent prior to Pratt and Whitney’s date of ownership of its exclusive rights to make, use, and sell in the aircraft and guided missile fields. This petition specified fuel control model VS-2. The effective period of this suit is October 2, 1951, to January 10, 1955.
(d) Petition 459-57 was filed 'by Reggio on October 2,1957, for infringement of both of the patents in suit prior to Pratt and Whitney’s date of ownership of its exclusive right to make, use, and sell in the aircraft and guided missile fields. This petition initially specified fuel control models AJ-A2 and TJ-A3, but was later amended to specify control model JFC-12. The effective period of this suit for models AJ-A2 and TJ-A3 is October 2, 1951, to January 10, 1955, for the '902 patent and from March 30,1954, to January 10,1955, for the '556 patent; the period covered for the JFC-12 is August 14,1952, to January 10,1955.
(e) Petition 5-59 was filed by Reggio on January 5, 1959, for infringement of both the '556 and the '902 patents. It was later amended to specify a number of fuel control models and predecessor models of the VS-2. The charges as to the predecessor models of the VS-2 were subsequently withdrawn. This suit covers the periods January 5, 1953, and March 30, 1954, to January 10, 1955, for the '902 and '556 patents respectively.
(f) Petition 6-59 was filed by Pratt and Whitney and Reggio on January 5,1959, for infringement of both the '556 and the '902 patents from the date Pratt and Whitney acquired the exclusive right to make, use, and sell in the aircraft and guided missile fields to the date of filing of suit 6-59. *845 It was later amended to specify a number of fuel control models.
(g) Petition 7-61 was filed by Eeggio on January 10, 1961, to cover the period January 10,1955, to September 30, 1955, in the event the retroactive assignment executed by plaintiff Reggio and the Niles-Bemont-Pond Co. on September 30,1930, is violative of the Anti-Assignment Statute, 31 U.S.C. 203. It is plaintiff’s position that the assignment was effective as of January 10, 1955, and that infringement in the above period should be covered by 82-57. This petition specified about twenty-three models and predecessor models of the VS-2 control.
(h) Petition 113-61 was filed by Chandler-Evans and Reggio on March 24,1961, for infringement of both the '556 and '902 patents during the period January 5, 1959, to the date of filing of this suit. This petition was later amended to include fuel control models AJ-A2, IEC, JEC-25, MFC-2, VS-2, WGC, and TJ-A3.
2. The identity of the parties plaintiff and their relation to each of the eight suits is as follows: Reggio, a resident of Norwalk, Connecticut, is and has been throughout the life of the patents the holder of the legal title. Pratt and Whitney, a Delaware corporation with an office at West Hartford, Connecticut, was exclusive licensee under the patents in the aircraft field in which infringement is charged from the effective date of the exclusive license until January 2, 1959. As noted in paragraphs (a) and (b) of finding 1, the relation of Reggio and Pratt and Whitney to suits 81-57 and 82-57 is set forth in the court’s opinion of July 12, 1957, cited above. Chandler-Evans, a Delaware corporation having an office at West Hartford, Conn., is a wholly-owned subsidiary of Pratt and Whitney which acquired from Pratt and Whitney by an agreement dated January 2,1959, and executed February 15, 1959, all of the rights under the '556 and '902 patents then owned by Pratt and Whitney.
3. Pursuant to the commissioner’s order dated July 3, 1961, all eight cases were consolidated for trial. It was further ordered by the commissioner that the trial be limited to issues relating to the right of plaintiffs to recover, *846 and that issues relating to the amount of recovery, if any, be deferred until the issues concerned with the right to recover have been decided. The trial involved the issues of validity of 31 claims of the '902 patent and 24 claims of the '556 patent and the infringement of one or more of those claims by various fuel controls. Also the questions of jurisdiction of the court under 28 U.S.C. 1498 to hear the case and whether defendants were licensees were considered at the trial. Originally the plaintiffs alleged infringement of nine basic fuel control models and numerous predecessor models of said nine models with a total of 541 different charges of infringement being involved. Plaintiffs have since withdrawn all issues but those listed below. The specific issues as to claims and infringing devices are as follows:

4. Defendant has in effect admitted the procurement of at least one of each of the accused controls during a period covered by at least one of the cases in suit and that each of the cases in suit covers a period in which at least one of the accused controls was purchased.
REGGIO PATENT 2,673,556
5. The '556 patent in suit discloses an aircraft engine fuel metering device designed to control the fuel-air ratio during

*0

*847 varied engine operating conditions. The patent teaches a fuel metering system wherein the pressure drop across a fuel orifice is continually varied as a function of mass air flow, measured by a Venturi and density bellows associated with a variable area air diaphragm; the size of said fuel orifice being adapted, at any specific condition, to be varied by any one of four independent parameters imposed on a fuel valve by means of mutually overriding cams. The '556 patent contains one drawing which is reproduced herein.
6. The fuel system disclosed in the '556 patent has an engine driven fuel pump 47 drawing fuel from a fuel supply 81 through an orifice 82, the effective area of which is controlled by a metering valve 88. The pump discharges fuel to the engine fuel supply manifolds which in turn supply the fuel injector nozzles 9 in the engine cylinders. Air under pressure is delivered through manifold 97 connected with the cylinder inlet ports. Excess fuel in the supply manifolds is circulated back to the inlet side of the pump through a by-pass conduit in which there is a regulating valve 85 controlling an orifice 87 through which the excess fuel flows back to the intake side of the pump 47. The fuel flow through the metering valve orifice 82 is equal to the engine fuel consumption. The regulating valve 85 is actuated by two pressure-responsive diaphragms 89 and 90 and is subject to the load of spring 115. Diaphragm 89 is subjected to the difference in pressures between the by-pass conduit and the fuel supply 81. Diaphragm 90 applies to valve 85 a force determined by Venturi air flow responsive mechanism and hydraulic servo motor 103 controlled by air density responsive bellows 104, which increases the effect of diaphragm 90 with increase of Venturi air density and loads the valve 85 in a direction to decrease the open area of the pressure regulating orifice 87. The input signal or force imposed on valve 85 by diaphragm 90 is thus a measure of engine air flow and any variation in the Venturi differential pressure or in the pressure and/or temperature of the air surrounding the bellows 104 actuates the valve 85 to alter the pressure head across the restriction 82 of the metering valve. A change in the speed of the engine is accompanied by a corresponding variation in engine air flow, and *848 variations in engine speed cause operation of the valve 85. The adjustable spring 115 biases the by-pass valve 85 in a direction assisting the pressure tending to close the valve orifice 87. The force of spring 115 is negligible when the engine operates at normal speeds.
7. To regulate the engine fuel-air ratio, manual as well as automatic control of valve 83, which is spring pressed toward closure, is provided to adjust the effective area of the orifice 82. This regulation is effected by four cams. One of these cams, 116, is manually controlled. The second, 117, is connected to a manifold air pressure responsive bellows 118. The third, 119, is responsive to engine speed measured by the fuel pressure drop sensed by diaphragm 120 across a fixed orifice 121 on the discharge side of the fuel pump 47. The members 47, 119, 120, and 121 are said to operate as a speed governor. The fourth cam, 122, is actuated by a bellows 123 connected to an element 124 responsive to the manifold air temperature and preferably also responsive in predetermined degree to the engine cylinder temperature. The patentee during the prosecution of the patent noted that the cams do not have a cumulative effect but rather operate independently and each may override the others and take over exclusive control.
8. The specification of the '556 patent makes no reference specifically to turbine-type engines. The '556 patent discloses only the application of an engine fuel control to a combustion engine having cylinders.
,9. Plaintiffs, as was indicated in finding 3, have asserted that 24 claims of the '556 patent have been infringed by the procurement and unauthorized use by defendant of the Bendix Gas Turbine Fuel Control Model TJ-A3, hereinafter referred to as the TJ-A3. Of these 24 claims, plaintiffs confined their proofs during trial to the following 7 claims:

Patent Claim, 1 of '556

In a system for controlling the flow of liquid fuel to the combustion chamber of an engine, means defining a flow passage for the fuel having a variable feed restriction therein, a first valve for selectively varying the area of said restriction to accelerate and decelerate the engine, a speed governor arranged to be driven from *849 the engine for actuating said first valve, a regulator valve movable to different positions to control the metering head across said restriction, means for automatically varying the position of said regulator valve with changes of engine speed, and means responsive to changes in pressure of the air flowing to the combustion chamber for modifying the action of the regulator valve.

Patent Claim 2 of '556

In a system for controlling the flow of liquid fuel to the combustion chamber of an engine having an engine driven compressor for supplying air under pressure to the combustion chamber, means defining a flow passage for the fuel having a variable feed restriction therein, a first valve to selectively vary the area of the restriction, a speed governor for actuating said first valve, a regulator valve movable to different positions to adjust the metering head across said restriction, pressure responsive means connected to the regulator valve, means for automatically producing a differential across said pressure responsive means varying with variations in engine speed, and means responsive to changes in pressure of the air flowing to the compressor for modifying said differential.

Patent Claim 3 of '556

In a system for controlling the flow of liquid fuel to an engine having a compressor supplying air under pressure, means defining a flow passage for the fuel having a variable feed restriction therein, a valve for varying the area of said restriction, a manually operable member operatively connected to said valve, an engine driven speed governor also having an operative connection with said valve, a regulator valve movable to different positions to adjust the metering head across said restriction, pressure responsive means connected to the regulator valve, means for subjecting said pressure responsive means to a differential varying with variations in engine speed to automatically maintain the rate of fuel feed within predetermined limits during acceleration and deceleration, and_ means responsive to changes in pressure of the air flowing to the compressor for modifying said differential.

Patent Claim J¡. of '556

In a system for controlling the flow of liquid fuel to an engine, means defining a flow passage for the fuel having a variable feed restriction therein, a valve for *850 varying the area of the restriction, manual means and engine speed responsive means for controlling the valve, a regulator valve controlling flow of fuel through said restriction, pressure responsive means connected to said regulator valve, means creating a force on said pressure responsive means in a direction tending to increase the flow of fuel through said restriction varying with variations in engine speed, and means for subjecting said pressure responsive means during operation of the engine to the differential feed pressure across said restriction in a direction tending to decrease the flow of fuel through said restriction.

Patent Claim 5 of '556

A system as claimed in claim 4 wherein means are provided for pressuring fuel to said regulator valve including an engine driven supply pump.

Patent Claim 8 of '556

In a system for controlling the flow of liquid fuel to an engine having an engine driven compressor for supplying air under pressure, means defining a flow passage for the fuel having a variable feed restriction therein, a valve to selectively vary the area of the restriction, a speed governor actuating said valve, a regulator valve movable to different positions to adjust the metering head across said restriction, pressure responsive means connected to the regulator valve, means for automatically producing a differential across said pressure responsive means varying with variations in engine speed, and means responsive to changes in temperature of the air flowing to the compressor for modifying said differential.

Patent Claim IS of '556

In a system for supplying liquid fuel to an engine, one or more fuel discharge nozzles, a pump for supplying fuel under pressure to said nozzles, a fuel conduit communicating said pump with said nozzles and having a metering restriction therein upstream of the nozzles, adjustable valve means for varying the flow through said restriction, manual means for adjusting said valve means, an engine driven governor operatively connected to said valve means for automatically adjusting the latter, and means responsive to changes in the pressure of the air flowing to the engine arranged to adjust the flow through said restriction independently of said governor.
10. The above seven claims include all elements or combinations of elements allegedly contained in the TJ-A3. The

*0

*851 remaining 17 claims charged as being infringed are drawn to various combinations of the elements recited in the above seven claims. Plaintiffs’ expert witness, Mr. Milton Chandler, identified the elements of these seven claims and related them to the allegedly corresponding elements of the accused TJ-A3 fuel control.
11. The source of the term “governor” recited in claims 1, 2, 3, 8, and 13 is apparently Mock’s patents 2,581,276 and 2,581,275 with which Eeggio unsuccessfully attempted to invoke an interference during the prosecution of the '556 patent application in the U.S. Patent Office. The governor disclosed in these Mock patents is of the fly-ball type and is used to regulate the speed of a gas turbine engine. The '556 disclosure contains no reference to a “governor.”
ACCUSED TJ-A3 CONTROL
.12. The Bendix Gas Turbine Control TJ-A3, which is charged to infringe claims 1-22, 33, and 34 of the '556 patent, is designed to meter fuel in a gas turbine type jet engine. This control is shown in the drawing reproduced herein and is described in plaintiffs’ exhibit 15, Air Force handbook AN 03-10BLA-1 dated May 19, 1950. Both parties have agreed that this publication illustrates the accused structure. The TJ-A3 was placed in use in 1946 on an Allison jet engine.
13. The TJ-A3 operates in the following manner: Fuel is supplied to the main control unit by a dual engine-driven fuel pump. As the fuel enters the unit, a by-pass and relief valve assembly regulates the amount of fuel being by-passed back to the inlet side of the fuel pump so as to maintain a constant pressure drop between fuel inlet pressure and metered fuel pressure (manifold pressure).
14. In the TJ-A3, the fuel, at the pressure determined by the by-pass valve, then flows to a regulator valve which adjusts the unmetered fuel pressure so as to maintain the desired fuel metering head (unmetered fuel pressure minus metered fuel pressure) across the governor valve in proportion to engine speed and inlet air density. The thrust from the centrifugal head generating weights, which sense changes in engine speed, is applied to a shaft on which the regulator *852 valve is mounted and to which the metering head diaphragm is attached. The opposing forces of the centrifugal weights tending to open the regulator valve and of the pressure differential across the metering head diaphragm tending to close it, control the opening of the regulator valve to provide the unmetered fuel pressure to furnish the required metering head across the governor valve, increasing with increasing engine speed and decreasing with decreasing engine speed at any given air density. The desired engine speed is selected by the pilot’s throttle lever, the movement of which determines the degree of opening of the throttle valve and sets up a definite governor valve spring force tending to open the valve, in opposition to the centrifugal governor weights which tend to close it. The density compensating circuit acts to maintain the pilot-selected engine speed during changes in temperature and altitude, thus preventing over-speeding of the engine and excessive engine temperatures which would result otherwise from governor droop. Governor droop is a situation which arises upon changes of load; i.e., if the load decreases, the governor would tend to let the engine overspeed if a compensating or corrective means were not provided. The density aneroid bellows responds to changes in air density and temperature and controls the position of the density compensating needle in- its orifice. Movement of this needle causes an increase or decrease in the flow of unmetered fuel through the density circuit control jets in the metering head diaphragm. This results in a change in force upon the metering head diaphragm. An increased force on the metering head diaphragm due for example to decreasing air density or increasing air temperature will move the regulator valve toward closed position, and cause lowering of the pressure of the unmetered fuel and a decrease of the metering head across the governor valve. The reverse occurs with increasing air density or decreasing air temperature.
TJ--A3 INFRINGEMENT ISSUE
15. The structural assembly of the TJ-A3 varies substantially from the fuel control described and illustrated in the '556 patent, and plantiffs have admitted that the TJ-A3 *853 does not employ the particular structure of the '556 patent. The question presented is whether there is sufficient identity of structure, operation, and result to support the plaintiffs’ allegation of patent infringement.
16. During the trial, defendant introduced through its expert witness, Mr. Howard J. Williams, substantial arguments in support of its contention that the TJ-A3 does not infringe any of the claims of the '556 patent. Mr. Williams developed the TJ-Al and TJ-A2 gas turbine fuel controls which were the predecessor models of the TJ-A3.
17. There is a significant difference in function as well as structure and result between the '556 control and the TJ-A3. The Eeggio control shown and described in the '556 patent is not suitable for use on a gas turbine jet aircraft, but is disclosed for use only with piston-type engines, whereas the TJ-A3 control was used only on jet aircraft engines and is not adapted for use with a piston-type engine. During the prosecution of the parent application for patent of which the '556 patent is an alleged division, Eeggio was advised of this fact when he attempted to invoke an interference with the Pearl patent 2,642,718 which had claims drawn to a control mechanism for “a gas turbine power plant.” Eeggio stated at this time, “It is believed that the limitation gas turbine which applicant cannot make is immaterial.” The patent examiner in response stated that because of the differences in the engines (piston and turbine), the respective controls used for each could not be considered as functional equivalents. The TJ-A3 was designed to avoid compressor surge or stall, acceleration blowout, and deceleration die-out, problems peculiar to gas turbine jet engines and represent considerations foreign to the control described in the '556 patent.
18. Plaintiff Chandler-Evans Corporation’s patent counsel, Mr. Augustin M. Prentiss, who is a patentee and a man of long experience in the field, urged at one time that jet engines and the structure associated therewith were non-analogous to piston engine controls such as those described by Eeggio in the patents in suit. In the prosecution of the Chandler application for U.S. patent 2,972,299 against which *854 both of tbe Eeggio patents here in suit were cited Mr. Prentiss stated in an attempt to distinguish over these patents:
Before discussing the disclosures of the references, it is pertinent to point out that the patents to Chandler, Stokes and Eeggio pertain to pis ton- iype engines driving propellers; the patents to Chamberlain, Holley and Halford to turbine engines driming propellers; and only the patent to Neal pertains to turbo-jet engines and this patent is cited only as disclosing the lubricating feature of Claim 2.
It is thus apparent at the outset that none of the references (except Neal) are concerned with the problems of turbo-jet propulsion aircraft to which applicant’s invention is addressed. Since the art and science of turbo-jet propulsion of aircraft differs so fundamentally from propeller propulsion, the two fields have little in common. The piston-engine art is still more remote from the turbo-jet engine art and the two differ so radically, as to have practically nothing in common. This being the case, it is clear that the references (except Neal) disclose nothing to aid in the solution of the manifold and complex problems that arise in the art of turbo-jet aircraft propulsion, and therefore the references do not, in any real sense, constitute anticipations of applicant’s invention. (Emphasis quoted.)
19. Another basic difference in the function of the two devices is the fact the '556 control is designed to maintain a constant fuel-to-air ratio in an engine. The '556 patent specification states:
An object of the invention is to provide an improved engine fuel control, which automatically and under all operating conditions whether steady or transient maintains the ratio between engine fuel flow and engine air flow within predetermined upper and lower limits.
The accused TJ-A3 control in contrast is incapable of regulating the fuel-to-air ratio, and this function is neither essential nor a problem in the operation of a gas turbine jet engine. Plaintiffs’ expert, Mr. Prentiss, in other patent applications prosecuted before the Patent Office, also emphasized this difference in the operation of piston-type engines and jet engines. For example he stated in the prosecution of the Lee patent 2,668,416:
*855 In connection with the foregoing, it is pertinent to point out that while the operation of piston type combustion engines (such as are involved in Stoke’s apparatus) is based upon controlling the flow of air to the engine and the fuel flow is adjusted to such air flow in order to form the desired mixture; the exact opposite principle of operation is employed in turbojet engines, where the flow of air is not controlled (as by a throttle) and the operation of the engine is controlled by regulating the fuel flow into the combustion chamber. The reason for this basic difference in the operation of the control piston type engine as compared to the turbojet engine, is that in the former it is necessary to maintain a close and definite quantitative ratio between the mass air flow and the fuel flow, whereas in the latter, no such close relationship is maintained or attempted. On the contrary, in turbojet engines the rate of mass air flow is many-fold greater than that required to form a proper combustible mixture with the rate of fuel flow, the excess air being utilized to promote the combustion of the fuel/air mixture. (Emphasis added.)
20. The TJ-A3 is essentially a governor which functions to maintain constant engine speed. A centrifugal flyweight arrangement is used to effect this control. The '556 control does not operate as a true governor since it does not control engine r.p.m., but rather is designed primarily to control the fuel-air ratio and the engine speed is controlled by a butterfly valve (air throttle 95), which varies the air flow.
21. Both the '556 control and the accused TJ-A3 device possess bellows which are responsive to air density and temperature and in a broad sense both regulate a valve assembly to adjust the metering head across a restriction; however, the bellows of the '556 control measures mass air flow whereas the bellows (density aneroid) of the accused structure is not responsive to either volumetric or mass air flow. Also, the bellows 104 of the '556 control does not affect the speed of the aircraft. The density aneroid of the TJ-A3 compensates for governor droop and operates to control the fuel flow and consequently the engine speed as conditions vary. The '556 control and the TJ-A3 also differ in arrangement. In the TJ-A3 the fuel passes from the pump to the regulator valve and then through a variable orifice in the governor valve. The '556 control is arranged in an inverse order as *856 the fuel flows first through the variable orifice 82 and is combined with the excess fuel from the regulator by-pass valve 85, and thence passes through the pump to fuel nozzles. In the '556 control, the amount of fuel allowed to pass through the orifice 82 is controlled by recirculating excess fuel, while in the TJ-A3, the regulator valve is in series with the governor valve and pump, and directly controls the fuel passing through the governor valve.
22. A comparison of the '556 claims and the TJ-A3 control follows:
(a) Claim 1 recites, a first valve * * * to accelerate a/nd decelerate the engine. The specification fails to disclose a valve (or any other means) capable of accelerating or decelerating the engine; thus this limitation cannot be applied because of lack of support, and claim 1 is not infringed by the T J-A3 control.
(b) Claims 1, 2, 3, 4, 5, 8, and and 13 all recite either an engi/ne or the combustion chamber of an engine. In order for the structure disclosed in the '556 patent to be operative the engine referred to must be of the piston type since the '556 control could not be utilized on a gas turbine engine. Furthermore, Reggio admitted during the prosecution of the '556 application in the Patent Office that he could not make limitations to gas turbine engines. The terminology of the above seven claims cannot be applied to a turbine engine structure and these claims are not infringed by the accused TJ-A3 control, which can be employed effectively only on turbine engines. All of the remaining claims alleged to be infringed but which were not compared with the accused structure during the trial, claims 6, T, 9-12, 14 — 22, 33, and 34, possess an equivalent limitation, i.e., either an engine or a powerplant, which again necessarily must be construed to mean a piston-type engine or powerplant, and these claims likewise are not infringed. None of the claims of the '556 patent asserted, namely, 1-22, 33, and 34 are infringed by the manufacture, sale, or use of the TJ-A3 control.
(c) Claims 1, 2, 3, 8, and 13 recite a governor, i.e., a speed governor or an engine driven speed governor. What the patentee intended by the use of these terms is not clear since *857 there is no description of a governor in the patent specification. Plaintiffs urge in requests for findings that the term governor used in the above '556 patent claims refers to a combination of parts including the fuel pump 47, fuel pressure responsive diaphragm 120, and valve-operating cam mechanism 119. The governor of the Eeggio control does not operate in the normal manner for, as was pointed out in-finding 20, it does not control speed, but rather operates in the maimer of a choke to control the richness of the mixture. The component of the TJ-A3 control designated by plaintiffs as a governor, the centrifugal governor, operates in the conventional sense in that it controls engine speed by appropriately varying fuel flow in inverse relation to engine r.p.m. variations. For example, if engine speed increases, fuel flow is thereupon decreased to reduce and restore engine speed to the desired r.p.m. Conversely, the '556 control increases fuel flow with an increase in engine speed. Claims 7, 9, 10-12, 15-22, 33, and 34, the elements of which were not read upon the TJ-A3 during the trial but which are also urged by plaintiffs to be infringed, contain similar governor limitations and the comments above are equally applicable thereto. None of the claims 1, 2, 3, 8, 10-12, 13, 15-22, 33, or 34 are infringed by the TJ-A3 control.
(d) Claims 4 and 5 call for the subjecting of the pressure responsive means (diaphragms 89 and 90) to the differential feed pressure across restriction 82. The Eeggio control has the diaphragm 89 connected on opposite sides to the upstream and downstream pressures adjacent to the orifice 82, and the differential pressure across the restriction is the same as the differential pressure across the diaphragm. This pressure differential is metered fuel pressure opposed to unmetered fuel pressure. In the accused TJ-A3 structure, the metering head diaphragm which has been alleged by plaintiffs to be the counterpart of diaphragms 89 and 90 is not subjected to the same differential pressure as the '556 control. Claims 6, 20, and 21 urged by plaintiffs as being infringed but not discussed during the trial by plaintiffs’ expert, Mr. Chandler, recite a similar limitation, claim 6 stating that said diaphragm means during operation of the engine being subjected to the diferential feed pressure across said restriction, *858 and claims 20 and 21 stating that the pressure responsive means be arranged, to respond to the drop across said restriction. The differences noted above are applicable to these claims as well. There is no infringement of claims 4, 5, 6, 20, and 21 by the TJ-A3 control.
(e) Claims 2, 3, 4, 5, and 8 specify that the '556 control possess a pressure responsive means or diaphragm which is subjected to a differential pressure which varies with air speed. For example, claim 2 states means for automatically producing a differential across said pressure responsive means varying with variations in engine speed; claim 3 recites means for subjecting said pressure responsive means to a differential varying with variations in engine speed; claim 4 recites means creating a force on said pressure responsive means in a direction tending to increase the flow of fuel through said restriction varying with variations in engine speed; claim 5 is dependent on 4; and claim 8 recites means for automatically producing a differential across said pressure responsive means varying roith variations in engine speed. The diaphragm or pressure responsive means referred to in these claims is an air diaphragm associated with a Venturi mechanism by which it is subjected to differential air pressure which varies with engine speed. The accused structure does not possess an air diaphragm and cannot be equated with the metering head diaphragm of the TJ-A3 control which is directly subject only to fuel pressure differences. The TJ-A3 does not have a Venturi and is not subject to differential air pressure which varies with air flow or with engine speed. Similarly, claim 9 which was not included in plaintiffs’ proofs at trial but is urged as being infringed calls for, means for subjecting said pressure responsive means to a differential varying with variations in engine speed, and does not, for the reasons discussed above, read on the accused TJ-A3 structure.
(f) Claim 14 describes the cooperative effort of diaphragms 89 and 90 with the Venturi mechanism to regulate the fuel-air ratio control means. The TJ-A3, as has been previously noted, is not concerned with the control of the fuel-air ratio and is incapable of maintaining such a ratio. There is no infringement of claim 14 by the TJ-A3 control.
*859 (g) Claims 14, 18, and 19 include means for monitoring engine or powerplant air flow. A Venturi is employed by Reggio to perform this function. The accused device bas no Venturi and does not measure air flow. Claims 14, 18, and 19 are not infringed by the TJ-A3 control.
23. Summarizing, it is concluded that none of the 24 claims relied upon by plaintiffs are infringed by the manufacture, use, or sale of the Bendix TJ-A3 turbine fuel control. The TJ-A3 and the '556 control perform significantly different functions to achieve different results, and the mere reading of words upon the accused device does not under those circumstances warrant a finding of infringement. The possibility of finding infringement is further obviated by the fact defendant has cited numerous prior art references including many of Reggio’s which deal with subject matter closely related to that covered in the '556 patent. The claims, in order to be valid at all over these references, must be strictly construed. Such a construction precludes any possibility of infringement by the TJ-A3 control.
REGGIO 2,673,556 INVALID
24. Defendant has advanced the following allegations in support of its contention that the Reggio patent 2,673,556 is invalid:
(a) The claims of the Reggio patent 2,378,036 which issued June 12,1945, on an application filed July 7,1941, fully cover the claimed subject matter of the '556 patent and the latter is invalid for double patenting.
(b) The subject matter of the claims of the '556 patent relied upon was presented for the first time in Reggio’s application for patent 6 years after the TJ-A3 control was in public use, and that the claims are thus invalid due to late claiming and laches.
(c) The subject matter of the '556 claims here in issue was fully dedicated to the public in 1945 by the issuance of Reggio patent 2,378,036.
(d) The claims to the '556 patent are not supported by the specification.
(e) The claims of the '556 patent in issue are anticipated by prior patents and publications having dates earlier than *860 the earliest possible date to which the subject matter of these claims is entitled. These prior patents and publications are as follows:
Hillbouse _ 1,483, 883 Feb. 19,1924
Jivbovitcb_ 2,193, 927 Mar. 19,1940
Chandler_ 2, 224,472 Dee. 10,1940
Hogg - 2.303, 640 Dec. 1, 1942
Wunsch_ 2, 341,257 Feb. 8, 1944
Mock _ 2,414,322 Jan. 14, 1947
Mock - 2,447,261 Aug. 17,1948
Beardsley_ 2,447,264 Aug. 17,1948
Beardsley-2,447, 265 Aug. 17,1948
Beardsley_ 2,447,266 Aug. 17,1948
Aero Digest, article, page 128. April 1940
25. With regard to the issue of double patenting, it is defendant’s contention that the patentee, Reggio, claimed both broadly and narrowly in his earlier patent 2,378,036, filed July 7,1941, and issued June 12,1945, all of the subject matter of the '556 patent claims in suit and that those claims are invalid as representing an attempt to unduly extend the patent monopoly. The '036 patent application, Ser. No. 401,353, antedates the patent application of the '556 patent, Ser. No. 508,897, by over 2 years. The '036 patent issued approximately 9 years before the '556 patent issued.
26. The '036 patent, Fig. 1 of which is reproduced at page 31, relates to, inter alia, a fuel metering system for internal combustion engines. The patent discloses a fuel metering device which comprises a fuel flow passage 18, 20 (81, 92) ,* having a restriction 42,48 (82), a fuel-air ratio control means 31, 32 (83) for varying the size of the restriction, a regulator valve 22 (85) which operates to vary the metering head across the restriction, a fuel pressure differential responsive means 52 (89) and an air pressure differential responsive means 68 (90) which control the movement of the regulator valve, a Venturi 8-10 (94) connected to the air pressure differential responsive means, an air density responsive means 64 (104) operatively associated with the regulator valve, a speed responsive means 128, 131, 50, 80 (119, 120,121) connected to the fuel-air ratio control means *861 to adjust the fuel-air ratio with changes of engine speed, an engine driven pump 118 (47) operatively associated with the speed responsive means, a manual control means 41,44 (116) for adjusting the fuel-air ratio control means, and a fuel discharge nozzle 21 (9) for discharging the fuel. The '556 patent claims in suit do not introduce any additional element nor do they call for a significantly different arrangement of elements from those described in the '036 patent above. The '036 patent completely discloses all the subject matter contained in the '556 patent claims in suit.
27. The evidence presented at trial demonstrated that the claims of the '036 patent fully cover both broadly and narrowly, the subject matter of the '556 claims. All of the '556 claims applied against the TJ-A3 control include a recitation of means for regulating pressure head across an orifice or restriction, in conjunction with speed responsive means for varying the area of the orifice or restriction. The patentee Eeggio stated, during the prosecution of his '556 application before the Patent Office, that this combination of elements was a part of his invention.
* * * all of the claims now in the instant case define a metering device having a first valve (82) actuated by a governor (119-121), a second valve (85) arranged to vary the pressure head across the first valve, and means (104) operating on the second valve upon changes of air pressure and/or temperature.
It was argued during prosecution of the '556 case in the Patent Office that this recitation of parts distinguished the claimed structure from the prior art and from the subject matter being claimed in the parent application. However, all of these elements listed as being essential by Eeggio were earlier claimed in his '036 patent. Claim 14 of the '036 patent is reproduced herein along with drawings from the '556 and '036 patents to illustrate the similarity of the subject matter disclosed and claimed in the '036 patent and disclosed in the '556 patent. The corresponding parts are indicated by connecting lines.
28. Eeference to claim 2 of the '556 patent demonstrates that Eeggio claimed the same subject matter as was previously claimed in claim 14 of the '036 patent. The numbers *862 below in () refer to the corresponding parts of the '036 patent drawing and in [] to the corresponding parts of the '556 patent drawing.

Olaim % of '556

In a system for controlling the flow of liquid fuel to the combustion chamber of an engine having an engine driven compressor for supplying air under pressure to the combustion chamber, means defining a flow passage for the fuel having a variable feed restriction therein (42, 48) [82], a first valve to selectively vary the area of the restriction (32) [83], a speed governor for actuating said first valve (80, 83, 85, 50) [119, 120, 121], a regulator valve movable to different positions to adjust the metering head across said restriction (22) [85], pressure responsive means connected to the regulator valve (68) [90], means for automatically producing a differential across said pressure responsive means varying with variations in engine speed (68 and 9, 10) [90 and 94], and means responsive to changes in pressure of the air flowing to the compressor for” modifying said differential (64) [104].
29. While the language of the '556 claims relating to a governor or speed responsive means for controlling the movement of the mixture control valve 83 is broad enough to read upon the governor shown in Fig. 1 of the '036 patent reproduced herein, the '036 patent shows in Fig. 4 a modification of the device illustrated in Fig. 1 having a governor or speed responsive means which is substantially the same in structure and operation as the speed responsive means illustrated in the '556 patent drawings. Additional claims of the '036 patent which further illustrate the fact the subject matter of the '556 patent claims was both broadly and narrowly claimed in the '036 patent include claims 1, 2, 4, 18, 20, and 21.
i30. During prosecution of the '556 patent, Neggio argued that '556 distinguished over the prior art because of the inclusion of a governor in the '556 claims for controlling the fuel valve 83. Eeggio’s alleged governor comprises the '556 engine driven pump 41 pumping fuel through orifice 121, in conjuction with a diaphragm 120, which senses the fuel pressure drop across orifice 121 and controls the movement of a cam means 119 connected to the mixture control valve

*0

*863 83. This same structure for controlling a fuel valve bad been previously disclosed in tbe '036 patent, wherein engine driven fuel pump 118 pumps fuel through orifice 128, with the fuel drop across orifice 128 being sensed by a piston 131 operating in substantially the same way as the '556 diaphragm 120. The '556 parts 120-121, in conjunction with fuel pump 47, which constitute the feature allegedly distinguishing ''556 from the prior art, had thus been fully disclosed in the prior '036 patent. Moreover the alleged governor had been fully and repeatedly claimed in the '036 patent. Claims of the '036 patent calling for the use of means responsive to engine speed for varying the fuel valve, which means is equivalent to the alleged governor used by Eeggio in his '556 claims, include claims 7, 14, 18-21, 24, and 26. Eeggio admitted that the alleged governors or speed responsive means of the two patents function in the same way.
Eeggio realized at the time the '556 application was being considered by the Patent Office that it related to subject matter of the '036 patent in view of his statement in the '556 patent that:
Certain features claimed herein are disclosed in my application Serial No. 401,353 filed July 7, 1941, now Patent No. 2,378,036 issued June 12,1945.
The above-quoted sentence was inserted in the '556 application by amendment after the Notice of Allowance had been received. While the '036 patent was cited by the examiner during the prosecution of the parent application of the '556 patent, there is no indication that the '036 patent was before the examiner during the time the '556 application was being considered, and plaintiffs cannot receive the benefit of a presumption that '556 is distinguishable or claims subject matter distinguishable from the '036 patent. The claims of the '556 patent 1-22, 33, and 34 are invalid for double patenting since they cover subject matter claimed in the previously issued '036 patent.
31. Defendant has urged that the claims of the '556 patent here in suit are invalid because the subject matter thereof not covered in the claims of the '036 patent had been dedicated to the public by the time the '556 application was filed. *864 It is unnecessary to consider this issue in view of the above findings of invalidity of all of the '556 claims in suit on the ground of double patenting.
82. In the event the defense of double patenting is held not applicable, claims 1-22, 33, and 34, all of the '556 claims asserted here by plaintiffs, are found invalid for late claiming. The patentee did not present any claim to the Patent Office for consideration which was directed to the same combinations of elements recited in the '556 claims in suit until at least 5 years after the TJ-A3 control had been in public use and on sale. The parties agreed that the accused TJ-A3 control was in public use and on sale in 1946. The '556 patent application was not filed until 1952. The parent application did not contain a claim which could possibly cover the accused TJ-A3 until September 1951. There is no satisfactory explanation of record for the long delay between the time the original application was filed and the time the subject matter of the '556 patent claims was presented to the Patent Office for consideration.
83. The Bendix-Stromberg carburetor described in defendant’s exhibits 3, 24, 25, and 27, which the parties have agreed was in public use and on public sale prior to February 1939, and which was fully disclosed in the periodical “Aero Digest” in April 1940, includes the structure and operation set forth in the '556 patent claims 1-22, 33, and 34, all of the claims in suit. The application of claim 2 of the '556 patent to the Bendix-Stromberg carburetor and to the '556 patent drawing is shown on a chart reproduced herein. The claims of the '556 patent here in suit are invalid since they are anticipated by subject matter which had been in public use, on public sale, and published prior to 1 year before the parent application of the '556 patent was filed in the U.'S. Patent Office.
34. All of the claims of the '556 patent in suit are also fully met by the Mock patent 2,447,261 which issued August 17, 1948, on an application filed October 24, 1940, and which discloses a charge forming device possessing all the features of the Bendix-Stromberg carburetor which are also common to the '556 device. Neither the Aero Digest article showing the Bendix-Stromberg carburetor nor the Mock patent
*0 REGGIO PATENT 2,673,556 BENDIX-STROMBERG CARBURETOR (fr98 *d 99 - 0 999“06¿ '556 CLAIM 2 In a system for controlling the flow of liquid fuel to the combustion chamber of an engin© having an engine driven compressor for supplying air under pressure to the combustion chamber, means defining a flow passage for the fuel having a variable feed restriction therein, a first valve to selectively - vary the area of the restriction, a speed governor for actuating said first valve, a regulator valve movable to different positions to adjust the metering head across said restriction, ressure responsive means connected to the regulator valve, means for automatically producing a differential across said pressure responsive means varying with variations in engine speed, and means responsive to change in pressure of the air flowing, to the compressor for modifying said differential.
(S 9 8 *d 30B¿) 99 - 0 999-06A 2,673,556 REGGIO In a system for* supplying liquid fuel to an engine, one or more fuel discharge nozzles, ^a pump for supplying^ “fuel under pressure to said nozzles, a fuel conduit communicating said pump with said nozzles and having a metering restriction therein upstream of the nozzles, adjustable valve means ■for varying the flow1 through said restrict-\ ion, ^manual means for adjusting said valve means, an engine driven governor operatively, 'connected to said valve means for autás matically adjusting the latter, kand means responsive to changes in the pressure of the air flowing to the engine arranged to adjust the flow through said restriction independently of said governor, »556 CLAIM 13 2,Ij47,261 MOCK
*865 2,447,261 were cited during the prosecution of the '556 patent application in the U.S. Patent Office. Defendant’s exhibit 48 compared the subject matter of all of the '556 claims in suit to both the Bendix-Stromberg carburetor mentioned above and to the control shown in Mock patent 2,447,261. The application of claim 18 of the '556 patent to the Mock patent 2,447,261 and to the '556 patent drawing is shown on a chart reproduced herein.
35. The Mock patent 2,414,322, which issued January 14, 1947, on an application filed January 13, 1941, meets every structural and operational limitation of the '556 claims asserted here. This patent was cited as a ground of rejection by the examiner during the prosecution of the '556 application in the Patent Office. Eeggio in arguing against the rejection contended that the '556 control contained a governor or speed responsive means for regulating the mixture control valve 83. It is noted that the Mock '322 structure also’ contains a mixture control valve which is responsive to engine speed. This '322 valve is adjusted inter alia, by a diaphragm having its opposing sides subjected to differential fuel pressures which vary with changes in engine speed and therefore is the equivalent of the '556 control.
36. The Chandler patent 2,224,272, which issued December 10, 1940, on an application filed May 2,1938, discloses a pressure fed carburetor which fully meets claims 4, 5, 6, 11, 12, and 14 of the '556 patent without modification and meets all of the other claims in suit by the addition of a governor thereto in a manner which would at the time have been obvious to one skilled in the art. This Chandler patent was not cited by the examiner during prosecution of the '556 application in the Patent Office.
37. The Wunsch patent 2,341,257, which issued February 8, 1944, on an application filed December 5,1938, and which refers to foreign filing date of December 1, 1937, discloses a device which controls fuel-air ratio containing a fuel orifice which has its size and pressure head controlled to meter fuel to an engine, particularly an aircraft engine. This patent illustrates all of the parameters including speed used by Eeggio in controlling the fuel-air mixture. The evidence indicates that certain of the plaintiffs regarded the Wunsch *866 patent as anticipatory of the '556 patent prior to their purchase of the '556 patent. Plaintiffs’ counsel, Mr. Prentiss, stated in an inter-company memorandum dated March 8, 1955, that:
* * * Claims, 7, 8, 10, 12, 18, 15, 17, 18, 19, 33, 34, and 36 of Eeggio 2,673,556 appear to be directly readable on Wunsch and, in my opinion, are anticipated by this reference.
The remaining claims in suit do not differ significantly from those cited in the memorandum and the comments made by plaintiffs’ counsel are equally applicable thereto. The Wunsch patent anticipates the alleged inventive concept of the '556 patent.
38. The Beardsley and other patents mentioned in finding 24 also allegedly anticipate the inventive concept of the Eeggio '556 patent. In view of the above findings of invalidity it is unnecessary to consider these patents in detail.
39. Summarizing findings 15-38, it is found that none of the '556 patent claims in suit are infringed by the TJ-A3 fuel control and that all of the said claims are invalid.
REGGIO PATENT 2,435,902
40. The '902 patent in suit relates to fuel metering devices for combustion engines which the patentee states are capable of “automatically controlling the engine supply of liquid fuel or the relative proportions of the fuel and air composing the engine combustible mixture” in response to changes in engine operating conditions. The '902 patent contains drawings which are reproduced herein.
41. The embodiment of the invention shown in Fig. 1 senses pressure and temperature of the air flowing to the engine 60, and applies to the regulation of the fuel flow a force proportional to the air density in the induction pipe 62, This is accomplished by means of a correction apparatus which comprises box 80, duct 81 which connects box 80 with the induction pipe 62, bellows 82 located within box 80 which measures induction air pressure, and bellows 95-96 also positioned within box 80 which measure air temperature. The air pressure and air temperature parameters measured by these bellows in box 80 are combined by a linkage

*0

*867 assembly to provide a load on rod 93 directly proportional to the air density in induction pipe 62. This load exerted on rod 93 is applied in turn to a multiplying lever assembly 74, at a distance from the fulcrum of said multiplying lever which is determined by a mixture control lever 78; and the overall mechanism, as shown in Fig. 1, thus gives for each adjustment of the mixture control lever 78 a corresponding constant fuel-air ratio. Figs. 3 and 4 show a refinement or modification of the arrangement of Fig. 1 comprising relatively small bellows 102 or 103 which can be added to the arrangement of Fig. 1. These bellows are designed to sense atmospheric or exhaust pressure and to modify the fuel-air ratio accordingly when the engine is scavenging its combustion chamber. Fig. 5 illustrates a modification of Fig. 1 in which a temperature bulb 130 is provided to measure the temperature of engine 60, and the temperature so measured operates a two-dimensional cam 135 so as to vary the mixture as engine temperature increases. A further modification of Fig. 1 is shown in Figs. 6 and 7. This modification comprises the addition of a three-dimensional cam 146, which is translated in response to engine speed by flyweights 148, and which is rotated in response to manifold pressure changes. The cam follower 137, positioned by this three-dimensional cam 146, operates a bell crank lever 74 in the same way that the manual level 78 operates bell crank lever 74, and effects automatic variation of the mixture as a composite function of engine speed and manifold temperature.
42. Plaintiffs have characterized the '902 invention as comprising the following combination of elements:
(a) Means for continuously sensing engine air intake as affected by changes in pressure and temperature to develop a force representative of the weight-flow of air and to apply that force, through a multiplying lever of adjustable effective length, to oppose a counter-force representative of the flow of fuel.
(b) A pilot’s lever arranged to manually position the point of application of the force to the multiplying lever, thereby manually adjusting the effective length of the multiplying lever to choose a desired engine fuel flow or fuel/air ratio.
(c) Means to superimpose automatic control responsive to changes in one or more chosen engine operating *868 conditions to automatically shift the point of application of the force to the multiplying lever thereby overriding and making ineffective the pilot’s choice!
(d) Mechanism, including a contoured cam having-two distinct ways of reversible adjustment together with means responsive to engine operative conditions for adjusting the cam in two distinct ways, whereby the mixture ratio may automatically be caused to vary as a predetermined function of two independent variables, said function being dependent on the configuration of the cam.
43. Plaintiffs have charged that the following fuel controls admittedly used by defendant infringe the '902 patent: The Pierce VS-2 and the unlicensed Niles-Bemenk-Pond VS-2 fuel regulators; the Bendix AJ-A2 gas turbine fuel controls; the Hamilton Standard JFC-25 fuel controls; the General Electric MFC-2 fuel controls, and the General Electric IEC fuel controls.
44. The claims of the '902 patent charged to be infringed and the various structures against which they are applied are set forth in finding 3. Plaintiffs, with the testimony of their expert witnesses, Mr. Chandler and Mr. Wright, confined their testimony during trial to the following 7 claims of the '902 patent:

Patent Claim 3 of '902

An. engine fuel control mechanism including fuel control means, means responsive to engine induction air pressure and temperature, adjustable means for oper-atively connecting said first and second mentioned means to keep the engine fuel supply substantially proportional to the engine air supply, cam means reversibly adjustable in two distinct ways and having a warped surface for altering the adjustment of said third mentioned means to vary the engine fuel-air ratio, means responsive to engine operative conditions for adjusting said cam means, and additional means whereby the engine fuel-air ratio may be altered independently of the adjustment of said cam means.

Patent Clavm 8 of '902

In combination with an engine having a fuel injection system and an air induction manifold, a fuel control mechanism including fuel control means, pressure and temperature responsive means, connected with said mani *869 fold, warped cam means having two ways of adjustment, an operative connection including servo-motor means for adjusting said fuel control means in dependence on the adjustment of said pressure and temperature responsive means, means for actuating said fuel control means in dependence upon the adjustment of said cam means, and additional means for varying the adjustment of said cam means in said two ways with changes of preselected engine operative conditions.

Patent Claim 18 of '908

In an engine control device, fuel control means, servo motor means for actuating said control means to control the engine fuel supply, means responsive to changes of engine induction air pressure and surrounding pressure for causing controlling movement of said servo motor means to keep the engine fuel-air ratio independent of variations of said pressure, mixture control means for varying said ratio, a warped surface, means for adjusting said mixture control means from a variable point of said surface, and means for varying said point thereof with changes of preselected operative conditions.

Patent Claim 88 of '908

An engine fuel metering device having a fuel pump adapted to be driven by the engine; control means for variably regulating the quantity of fuel supplied by the pump to the engine; and automatic means for actuating said control means, including: pressure responsive means for metering the engine fuel supply in accordance with two operating pressures both of which pressures affect the engine air supply; temperature responsive means for metering the engine fuel supply in accordance with an engine operating temperature; and speed responsive centrifugal means adapted to be driven from the engine for metering the engine fuel supply, in accordance with engine speed.

Patent Claim 1¡5 of '908

Engine fuel supply device including a fuel pump; means for driving the pump from the engine; and oper-atively interconnected manual and automatic means for controlling the engine fuel supply; said automatic means including speed responsive governor means for regulating the. engine fuel supply with changes of engine speed, and barometric pressure responsive means for altering the engine fuel supply with changes of altitude.

*870
Patent Olaim 63 of '902

For an engine having at least one combustion chamber, a first passage leading air thereto and a second passage leading combustion products therefrom, a fuel and control system having a fuel pump; means for driving the pump from the engine; and means for controlling the flow of fuel supplied by the pump to the combustion chamber, including: pressure responsive means to. vary the fuel flow to said combustion chamber automatically with changes of pressure in the first passage, speed responsive means to alter said fuel flow automatically as a function of engine speed, manually actuated means to control the effect of one at least of said responsive means, and temperature responsive means adapted to be subjected to the temperature in the second passage to vary said fuel flow in a direction to decrease the temperature in the second passage upon attainment of predetermined values of said temperature.

Patent Olaim 71 of '902

Engine fuel and control system including a fuel pump; fuel flow regulating means for varying the flow of fuel supplied by the pump to the engine; engine driven speed responsive means; temperature responsive means subjected to an engine operating temperature which is dependent upon the flow of fuel supplied to the engine; and motor means operatively connected to said speed and temperature responsive means to be actuated thereby for operating the fuel flow regulating means.
45. At trial Mr. Chandler attempted to correlate the elements of claims 3, 8, 12, 38, and 45 with the Hamilton Standard JFC-25 controls; the elements of claims 8, 38, and 45 with the Bendix AJ-A2 controls; the elements of claims 3, 8, and 45 with the General Electric MFC-2 controls; and the elements of claim 45 with the Niles-Bement-Pond VS-2 controls. He later acknowledged that claims 51, 54, 55, 56, and 65 contain the same elements as claim 45 and could also be applied to the VS-2 controls. At trial Mr. Wright attempted to correlate the elements of claims 63 and 71 with the General Electric IEC controls.
ACCUSED VS-2 CONTROL
46. The Niles-Bement-Pond VS-2 fuel control which is shown and described in plaintiffs’ exhibit 12, particularly *871 in Fig. 1-2, which, exhibit is incorporated herein by reference, is a fuel regulator designed to permit the flow of all the fuel that can be safely used during engine acceleration and limits the fuel flow to the lowest value that will assure the continuation of combustion when the engine is decelerating.
¡47. The YS-2 control operates in the following manner: The fuel regulator is driven by the engine and is connected through a linkage to the pilot’s throttle lever by manual control shaft 31. For any given throttle setting the fuel feed is regulated by the variable control oil pressure, hereinafter called YCO, applied to the control valve 18 through line 19. The oil from pump 56, controlled by relief valve 60, supplies constant pressure control oil hereinafter called CCO, which, through servo valves 7, 27, and 46, increases or diminishes YCO pressure by admitting CCO or releasing it through the YCO 'line. Pressure of the YCO varies between predetermined minimum and maximum values for operation of the fuel pressure control valve 18. Actual pressure is affected by the position of the pilot’s throttle lever, altitude, and engine speed. YCO pressure is subject to altitude compensation and overspeed governing at all engine speeds. Altitude compensation is effected by compressor discharge pressure in bellows 8; the overspeed governing is effected by the flyweights 48 of the centrifugal speed limiter which controls the admission of CCO to the governor over-speed piston 37.
Altitude compensation in the YS-2 control is provided by bellows assembly 8 and 11 which sense the absolute pressure of compressor discharge air. As this absolute pressure increases, expansion of bellows 8 forces altitude control lever 14 downward causing altitude cam 17 to move the cam follower and ratio-roller 21 to the left by the action of altitude servo valve 7 and altitude piston 16. This effects an increase in the load upon main spring 29 which is applied to main piston 23 to increase the YCO pressure applied to the fuel pressure control valve 18. The flow of CCO for this purpose is limited by the flow-limiting chopper valve 49 in the speed governor drive shaft 56. Overspeed control is provided by governor flyweights 48 which upon a sudden in *872 crease in speed raise governor valve sleeve 47 and admit CCO to governor overspeed piston 37, causing it to lift main lever 28 out of contact with manual control rod 33 to reduce YCO pressure applied to fuel pressure control valve 18.
ACCUSED AJ-A2 CONTROL
48. The Bendix AJ-A2 gas turbine fuel control, which is described in plaintiffs’ exhibit 10, drawing Fig. 1-4, which exhibit is incorporated herein by reference, is a cam type speed density fuel control unit incorporating both main and emergency fuel metering systems.
49. The AJ-A2 main system is designed to deliver to the engine the correct fuel flow under any condition within the operating range of the engine. The fuel flow is scheduled to (1) enable the engine to by-pass the compressor stall zone during acceleration, (2) maintain engine temperatures within desired limits during acceleration, (3) prevent lean die-out during deceleration, and (4) maintain any fixed engine speed within operating limits, regardless of altitude. The emergency system of the fuel control, which is a means of by-passing the main system, allows direct manual control over fuel flow if there is failure in any part of the main system.
50. The AJ-A2 fuel control operates in the following manner: As fuel enters the control the main by-pass valve* maintains a constant pressure drop between fuel pump discharge pressure Px and metered fuel pressure P4; by-passing excess fuel to the inlet of the fuel pump. The constant pressure drop Pi minus P4 established by the by-pass spring force is effective at the metering valve orifice. The area of the metering valve orifice is determined by a combination of variable parameters, pilot’s control lever angle, engine speed, compressor inlet temperature and compressor discharge pressure. The engine speed is sensed by the speed servo -flyweights and by the metering valve governing flyweights driven from the engine through the engine drive spline. The compressor inlet temperature is sensed by the temperatwre sensing probe. The compressor discharge pressure is sensed *873 at the Pt<t pressure bellows. Movement of the pilot’s control lever opens the metering valve and at the same time rotates the governor setting cam to load the spring of the metering valve and sleeve. As the pilot’s lever is rotated, it moves the link extending vertically downward from the shaft and engages a rod horizontally positioned to the right possessing a rack which engages a gear attached to the governor setting cam. This cam contacts the lever at its right, attached to a vertical shaft, at the other end of which is another lever operated in connection with a power boost servo valve. When the power boost servo valve is closed, the power boost piston moves to the right, engaging the maximum r.p.m. adjustment lever, and to the right of this engages another lever, the end of which engages the governor spring. Metering valve governing flyweights driven from the engine operate on the metering valve stem tending to close the valve as speed increases until the desired speed is reached.
51. The AJ-A2 temperature sensing probe responds to change in compressor inlet air temperature and repositions the governor setting cam and the acceleration setting cam by axial movement of the cam shaft. These cams are contoured to properly bias fuel flows for temperature changes. During acceleration this arrangement limits maximum opening of the metering valve and provides maximum fuel flow for any given ambient air temperature. The horizontal rod extending toward the left from the metering valve has a head which engages one arm of the bellcrank which engages the acceleration cam and thereby limits the movement to the right of the fuel valve during acceleration. The positioning of the governor setting cam by the axial movement of the cam shaft varies the load on the metering valve spring and the amount of opening of the metering valve according to the various stations on the contoured governor setting cam as it is moved axially by the temperature sensing probe.
52. The AJ-A2 speed system, sensing changes in engine speed, repositions the acceleration setting cam in a rotating direction to limit the maximum open position of the metering valve in relation to speed. Above the metering valve governing flyweights there is a set of speed servo flyweights which actuate the servo valve which in turn actuates the *874 speed piston. Connected to this speed piston is a rod, and on this is a rack, engaging a gear on the vertical shaft which is moved by the temperature probe. Connected to this rotating member is the acceleration setting cam so contoured that the rotating movement affects the cam follower position only at predetermined compressor inlet air temperatures where the thermostatic probe and bellows assembly has moved the acceleration cam setting to a specified axial position. The speed servo flyweights driven from the engine act on the speed piston to rotate the cam shaft and the acceleration setting cam.
53. The AJ-A2 compressor discharge pressure signal rotates the metering valve to increase metering valve orifice area with increase of compressor discharge pressure. Referring to the Ptt power piston, as the compressor discharge pressure increases it causes the Put pressure bellows to collapse moving the end of the rocker shaft down causing its lower end to move to the left. This closes off the servo valve, which increases the pressure on the top side of the power piston, forcing it to the right until the spring is compressed to a point where it returns the rocker shaft to its neutral position. This power piston and rack rotate a vertical shaft which extends downward and at the end of which is a beveled gear. This beveled gear operates another beveled gear attached to the fuel valve which changes the area of the fuel valve orifice. The compressor pressure limiter protects the engine from unsafe internal pressure by sensing the excess of compressor discharge pressure above engine compartment pressure and opens the limiter valve to reduce the compressor discharge pressure signal and in turn through a linkage connected to the metering valve orifice, the rate of fuel flow, when the differential exceeds a preset limit.
accused JFC-25 CONTROL
54. The Hamilton Standard JFC-25 hydromechanical fuel control, shown in a drawing from plaintiffs’ exhibit 7 reproduced herein, is designed to schedule the quantity of fuel flow required by a high thrust jet engine. The JFC-25 control functions to deliver the designed amount of engine thrust as dictated by the position of the power lever in the

*0

*875 cockpit and by particular operating conditions of tbe engine. It consists of a metering section and a computing section.
55. The metering section allows a metered portion of fuel to pass into the engine of the JFC-25. The fuel is supplied to the JFC-25 control inlet* by a fuel pump and passes to the filtering system. After passing through the filtering system, the fuel encounters the pressure regulating by-pass noire designed to maintain a constant differential across the throttle valve, 'by-passing all excess high pressure fuel back to the pump. The high pressure fuel, at the established constant pressure head, then passes through the throttle valve which consists of a contoured plunger within a sharp-edged orifice which is positioned by the computing section of the control by a force from the burner pressure sensing bellows acting on a set of rollers through a pivoted lever which extends downwardly in a direction to move a spring-supported L-shaped lever to the right, i.e., in a -flapper valve closing direction. This force is opposed by the force of a spring cooperating with the piston attached to the throttle valve. The fulcrum or roller position is chosen by the setting of the pilot’s power lever, limited by the contour of a three-dimensional acceleration limiting cam which is translated axially by a temperature sensing mechanism and is rotated by engine speed sensing servo mechanism. By virtue of the constant pressure drop maintained across the throttle valve, the fuel flow is controlled by the position of the contoured plunger relative to the area of the throttle valve orifice. The path of fuel flow, under the constant pressure differential, is through the throttle valve orifice and the connected conduits directly to the engine nozzles.
,56. The computing section of the JFC-25 positions the throttle valve to control fuel flow during steady state operation, acceleration, and deceleration. This is accomplished by a multiplying system whereby the signals for acceleration, deceleration, or steady state speed control are multiplied by a compressor discharge pressure signal sensed by a metallic bellows internally exposed to compressor discharge pressure, and opposed by an evacuated bellows of equal size. The net force, proportional to absolute compressor discharge pres *876 sure, is transmitted through an adjustable fulcrum — a set of rollers which ride between the compressor-discharge-bellows-actuated lever and a right angle multiplying lever— through which they transmit a force proportional to compressor pressure, in opposition to a spring which transmits to the multiplying lever a force proportional to the throttle valve opening. The above multiplying system includes the lever extending downward from the 'bumer-'pressure-sensing valve to bias, through said set of rollers, the said spring-supported right-angle lever to the right against the spring which rests against the piston of the throttle valve. Multiplication is effected by varying the position of the fulcrum or rollers to modify the leverage between the burner-pressure-sensing lever and the throttle valve. Deceleration control is accomplished by placing a minimum ratio adjustment on the roller-positioning linkage. Acceleration control is accomplished by placing on the roller position a maximum ratio adjustment, positioned by a three-dimensional deceleration limiting cam. This cam is adjusted by a force proportional to engine speed and is shifted axially by a force proportional to engine inlet temperature, and is contoured to define a schedule of fuel flow calculated to avoid the over-temperature and surge limits of the engine without compromising engine acceleration time. The signal proportional to engine speed is derived from the speed sensing servo which extends vertically and has a gear rack on the face of it. The signal proportional to temperature is derived from the temperature sensing bulb. The sensing of the speed and the temperature signals avoids surge by limiting the fuel flow to an amount that keeps the engine out of this surge condition. The compressor pressure limiting valve senses compressor discharge pressure as compared to ambient pressure. When this differential exceeds a preselected maximum, the compressor discharge signal is reduced by bleeding pressure from the limiter valve, thereby reducing fuel flow and combustion pressure to the maximum safe pressure. This is effected by a bellows in the limiter which responds to compressor discharge pressure (burner pressure) on one side and ambient pressure on the opposite side. When the burner pressure exceeds the atmospheric pressure by a given amount *877 the bellows expands to tbe right against a spring force and opens a valve which bleeds the burner pressure to atmosphere reducing the subsequent pressure that is sensed by the burner-pressure-sensing bellows.
57. In the JFC-25, a speed sensing governor, driven from the engine, controls through a pilot valve the movement of a speed sensing servo piston whose position is thus indicative of actual engine speed. This piston incorporates a rack which meshes with a gear on a shaft on which the acceleration three-dimensional cam is mounted to provide for adjustment of said cam responsive to the speed signal for acceleration limiting. The servo piston is also utilized to hold the selected engine speed within safe limits by repositioning the droop cam. As the speed continues to increase, the speed servo goes down and adjusts the droop cam counterclockwise, which in turn raises the roller and level contacting it, and this in turn raises the ratio lever that is attached to the roller carrier to reduce fuel flow and control speed. The temperature-sensing-bulb and servo assembly which senses the temperature of the compressor inlet air is connected through an out-put lever and yoke assembly to the three-dimensional acceleration-limiting cam. The servo piston shifts the acceleration-limiting cam which integrates the temperature and speed signals. A compressor inlet pressure servo assembly actuates a -flapper val/oe which repositions a servo piston connected to a lever which shifts the speedset-cam and repositions the reset lever and roller bracket for speed reset at altitude.
accused MFC — 2 CONTROL
58. The MFC-2 fuel control, a drawing of which from plaintiffs’ exhibit 16 is reproduced herein, operates in the following manner: Fuel under pressure is pumped to the MFC-2 control by a gear pump* driven from the engine. The constant differential pressure by-pass vadve ma.i-nt.ains a constant fuel pressure differential across the metering valve. The metering valve controls the quantity of fuel delivered by the control to the engine. It is moved to the right by fuel *878 pump pressure (Pp). It is moved to the left by the metering valve servo, the orifice of which is controlled by the Wf or orifice control lever. This lever is L-shaped, a fulcrum joined with two arms, and is connected to the metering valve spring. Fuel flow increases with increased tension on the spring and is proportional to the spring force. The force of the metering valve spring is opposed by the force on the Ps lever which acts through the fulcrum-rollers on the horizontal arm of lever W£. The P8 lever is moved by the P3 (compressor discharge) pressure sensing bellows, which expands and moves the P3 lever clockwise with increase of pressure. The further the rollers are to the right, the greater is the ratio of the fuel flow to the P3 pressure.
59. The MFC-2 fulcrum-rollers are moved by the lower end of the drive lever which is biased by the linkage loading spring, and which rotates about a prnot adjustment and is connected at the upper end to the Z-rod which rests against the topping lever. The upper end of the topping lever rests against one side of the 3-D earn, while an intermediate point of the same lever is positioned through a rod and the speed set lever by the manual earn, which is moved by the pilot by means of the power lever and the input cam shaft. The 3-D cam is moved axially by the governor hi response to engine speed. As the speed of the engine increases, the centrifugal force of the flyweights moves them outward. This forces the servo valve to the right, opening up a port at the right-hand side of the power piston. This moves the power piston to the left and in so doing the feedback lever moves clockwise, increasing the force on the spring acting on the servo valve to restore it to its neutral position, thus establishing a new position for the power piston. A movement of rotation is imparted to the 3-D cam by the Tz sensor which senses the engine inlet temperature. As the T2 sensor experiences an increase in temperature, the gas in the sensor expands, causing the T2 motor bellows to expand or move to the right. This moves the servo valve in the T2 motor and causes the pivoted lever to rotate the 3-D cam. The acceleration limiting lever is moved by the left-hand surface of the 3-D cam as seen in the end view of the cam in the small box. A T2 bias lever moves a linkage to control an

*0

*879 acceleration valve and also to move the fulcrum of the speed set lever in order to reduce the set engine speed at cold temperature. As the pilot moves his power lever and rotates the manual cam clockwise to increase engine speed, the motion is transmitted through the speedset lever, the rod, the topping lever, the Z-rod, and the drive lever to the rollers, which move to the right increasing the Wt/Ps ratio. If, however, during the said controlling action of the pilot, the displacement of the Z-rod to the left attains sufficient amplitude, the shoulder of the Z-rod comes into contact with the acceleration limiting lever, whereupon the power lever becomes disconnected from the Z-rod, and the control of the Z-rod and dependent structure is transferred to the 3-D cam. The lever marked TR bias to the right of the acceleration-limiting lever moves a linkage to move the fulcrum of the speed set lever in order to reduce the set engine speed at cold temperature.
ACCUSED IEC CONTROL
60. The General Electric IEC control is an electrical fuel control for jet engines. It comprises in part an isochronous governor in the form of an electric tachometer which operates as a speed control. The IEC is described in plaintiffs’ exhibit 21, which is incorporated herein by reference. Neither this exhibit nor any other in evidence shows all of the essential components of the IEC in a single drawing. The IEC control was described by plaintiffs in the following language:
The system provides for regulation of fuel flow to the main burner and the afterburner and the regulation of the variable-area jet nozzle of the J47-GE turbojet engines (Par. 2-3).* The fuel flow is regulated in response to the manually selected thrust selector (Par. 2-20) modified by the engine conditions of speed, compressor discharge pressure, compressor inlet temperature, and exhaust gas temperature (Par. 1-2,1-7, 2-19). For the purpose of these suits the control portion relating only to the main burner is considered. The engine conditions are sensed and converted to electrical voltages by transducers (for: speed Par. 1-10; compressor discharge pressure Par. 1-12 and Fig. 5-32; compressor inlet temperature Par. 1-12; and exhaust gas temperature Par. 1-42). *880 The electrical voltages are integrated by appropriate circuitry which computes a resultant voltage used to operate the motor-driven main fuel valve (Par. 1-19 and Figs. 2-16 and 5-39) thereby to regulate optimum fuel flow to the engine within minimum and maximum limits to prevent stall and blowout, exceeding topspeeds and overtemperature (Par. 2-23 and 2-24) and to provide proper fuel flow for fastest acceleration under the given conditions (Par. 2-6).
A detailed explanation of the operation of the system is given in the T.O. at Par. 2-192 through 2-420.
The fuel flow is at first selected by the pilot’s thrust selector lever which, by means of a potentiometer (speed card), applies a voltage as an input signal via lead 1 to the Main Fuel Valve Amplifier. The Amplifier converts this signal to an appropriate voltage to operate the Main Fuel Valve by means of a motor.
The speed of the engine is sensed by an amplidyne tachometer, the tachometer circuit portion of which provides a voltage which is compared to the potentiometer voltage produced by the pilot’s lever position to modify the pilot’s selection. The difference of the two voltages (so-called “speed error signal”) is used to position the Main Fuel Valve (Par. 2-240 — 2-259). The system thus allows “the proper fuel flow for a given engine speed” (Par. 2-262).
“However, it is impossible to set one control, such as the throttle, to cover a wide range of varying flight and engine operating conditions without moving it to increase or decrease the fuel flow accordingly. Since continuous movement of the throttle to compensate for changing conditions is not practical or possible, the only alternative is to ‘extend’ or ‘limit’ fuel flow by some additional or supplementary means which is completely independent of manual control” (Par. 2-262).
The means, which further, in addition to speed, automatically, independently modify the manual control, sense compressor discharge pressure (Par. 2-278) compressor inlet temperature (Par. 2-276), exhaust gas temperature (Par. 2-279, 2-281) and topspeed (Par. 2-272) and by means of transducers produce voltages to modify the input signal to the amplifier as compared to the voltage selected by the pilot, thereby to reposition the Main Fuel Valve for a fuel flow appropriate for the engine during steady state and transient conditions (Pars. 2-264; 2-276; 2-281; 2-290-1).
*881 .61. The IEC control is an integrated electronic control system comprising a relatively large number of interconnected electric circuits operating and operated by various devices, as distinguished from the accused VS-2, AJ-A2, JFC-25, and MFC-2 controls which operate through mechanical elements directly interconnected. Neither of the patents in suit discloses any electrical circuitry nor electrically operated devices.
'9 02 INFRINGEMENT ISSUES IN GENERAL
62. The gas turbine engines with which the accused controls are used have separate and completely independent regimes of operation, the steady state and the transition state. Plaintiffs have charged infringement of selected claims of the '902 patent by the accused controls only when the controls are used to control the operation of gas turbine engines in the transition state, that is when the engines are accelerating or decelerating. Each of the accused controls has different structural parts in operation respectively during its transition and steady state regimes. During the trial, counsel for plaintiffs stated:
This litigation is based on the charge of infringement of patent No. '902, which infringement occurs during the period of acceleration and deceleration, and not at all during the period of normal speed or steady state, or whatever you call it.
63. The '902 patent is an alleged division of a Eeggio application filed in 1939. The parent application related to a fuel metering device for piston type engines. Such terms as “induction” pressure or temperature “scavenging,” “fuel-to-air ratio,” and “manifold” which are used in the parent application and in the description of the '902 control in the '902 specification are meaningful only when considered in connection with a piston type engine. In this connection, reference is made to the statement of plaintiffs’ witness, Mr. Prentiss, quoted in finding 18. The '902 patent as issued contains a paragraph which states that the invention is in no way limited to use with reciprocating engines, but may be used in connection with the “internal combustion turbine,” the “turbo-jet engine,” the “turbo-propeller engine” *882 and rocket engines. Reggio added, this paragraph at the time the alleged divisional '902 application was filed in 1947, over 8 years after the parent application was filed, and after jet aircraft tnrbine engines were developed and publicly disclosed. One of the issues is whether or not certain of the claims in suit which originated in the parent application may be expanded in scope to cover control devices for jet turbine engines.
i64. The '902 fuel metering device contains a barometric, atmospheric, or surrounding air pressure responsive means which has been compared by plaintiffs for the most part with the compressor discharge pressure sensing bellows of the accused devices; however, these two pressure responsive means are not equivalents. The barometric or atmospheric pressure measured by the bellows of the '902 patent would always vary with changes in altitude, while the compressor discharge pressure sensed by the accused controls may vary widely at a given altitude and may be the same at two widely different altitudes, depending on the engine operating conditions. The pressure and temperature responsive elements of the '902 device are arranged to cooperate in the measurement of air density and to adjust the fuel-air ratio in accordance with changes therein. Measurement of compressor discharge pressure or joint measurements of compressor discharge pressure and temperature by the accused controls differ widely from the pressure and temperature measurements and the purpose of said measurements, achieved by the '902 device.
65. Plaintiffs have asserted that the governor or speed responsive means of the '902 device is equivalent to the speed governors which include flyball structures or a tachometer of the accused controls. The '902 governor, however, performs a significantly different function than do the governors or tachometer of the accused structures in that the '902 governor regulates mixture richness without changing engine speed, whereas the speed governors or tachometer of the accused controls are provided to control engine speed by varying the amount of fuel allowed to pass to the engine and do not control mixture richness. Limitation of the '902 claims to a governor or structure equivalent to the Reggio *883 governor, which varies only the mixture richness, warrants a finding that the '902 claims in suit reciting such structure are not infringed by any of the accused controls.
¡68. The '902 metering device contains as the primary means for controlling the amount of fuel delivered to the engine, an engine driven fuel pump which delivers fuel in proportion to the speed of the engine. The fuel pumps employed by the accused controls do not deliver fuel in proportion to engine speed. Control of fuel flow is achieved by valve arrangements downstream of the pump, rather than by the pump itself in the accused controls.
67. Plaintiffs have asserted that the manual control levers of the ’902 patent are equivalent to the manual control levers of the accused devices. The evidence does not support this position. Of the two ’902 manual levers, one is provided to vary engine speed by varying the air flow to the engine, and the other is provided to control mixture richness without significantly affecting engine speed. None of the accused devices use a manual control lever to either vary air flow or control mixture richness. The manual levers employed by the accused devices are provided to set speed governors to achieve the desired speed control.
AJ-A2 INFRINGEMENT ISSUE
68. As noted in finding 45, plaintiffs urged at the trial that claims 8, 38, and 45 of the '902 patent are infringed by the AJ-A2 control. Claim 8 of the '902 patent recites pressure and temperature responsive means connected with, said manifold and additional means for varying the adjustment of said cam means. In attempting to read claim 8 upon the AJ-A2 control, plaintiffs have relied upon the temperature sensing probe of the AJ-A2 as meeting both of these provisions. During the prosecution of the parent application of the '902 patent, Eeggio made it clear that the additional means referred to something additional to the manifold pressure and temperature responsive means. It is a misapplication to correlate the single temperature sensing probe of the AJ-A2 against both of the elements or means noted above. The temperature sensing probe of the AJ-A2 performs a different function than the '902 temperature re *884 sponsive means in that it measures compressor inlet temperature and not manifold temperature. Tbe pressure and temperature responsive means of tbe '902 patent must be located in tbe same vicinity to sense air density. In the AJ-A2 control, pressure is sensed at tbe burner inlet and temperature is sensed at the compressor inlet. They are not and cannot be combined to measure air density. There is no infringement of claim 8 of tbe '902 patent by tbe AJ-A2 control.
69. Claim 88 of tbe '902 patent recites a fuel pump adapted to he driven hy the engine, pressure responsive means for metering the engine fuel suppl/y in accordance with two operating pressures hoth of which pressures affect the engine air supply, and speed responsive centrifugal means adapted to he driven from the engine for metering the engine fuel supply in accordance with engme speed. Tbe fuel pumps and centrifugal flyweights of tbe '902 patent and the AJ-A2 are not functional equivalents for tbe reasons discussed in findings 65 and 66. Tbe burner pressure limiter of tbe AJ-A2, one of the two means said by plaintiffs to correspond to the pressure responsive means of claim 38, does not affect tbe engine air supply of the A J-A2, in the sense that engine air supply is affected in tbe '902 device. There is no infringement of claim 38 of tbe '902 patent by tbe AJ-A2 control.
70. Claim 45 of tbe '902 patent recites barometric pressure responsive mea/ns for altering the engine fuel supply with changes of altitude and operatively interconnected manual and automatic means for controlli/ng the engine fuel suppl/y. The barometric pressure responsive means has been equated by plaintiffs with tbe compressor discharge pressure sensor of tbe AJ-A2. As noted in finding 64, tbe pressure responsive means of the '902 patent and tbe compressor discharge sensmg means of tbe AJ-A2 control are not equivalente. The compressor discharge pressure bellows of tbe AJ-A2 control is not responsive to atmospheric or barometric pressure, but to burner pressure, which is subject to many of the factors which affect combustion, and particularly to the speed of tbe compressor. Tbe burner pressure may vary widely depending upon a number of operating conditions. *885 Plaintiffs have compared the manual control means of claim 45, mixture control lever 78 of the '902 patent, with the pilot’s control lever of the AJ-A2. As noted in finding 67 above, the pilot’s control lever of the AJ-A2, along with the other comparable manual levels of the accused controls, performs a significantly different function than the '902 mixture control lever, in that it sets a speed governor to achieve speed control rather than adjust the fuel-air ratio, the fimction of the '902 mixture control lever. The AJ-A2 control does not infringe claim 45 of the '902 patent.
71. All of the other '902 patent claims charged in plaintiffs’ requests for findings against the AJ-A2; namely, claims 25, 36, 43, 48, 47, 48, 51, 54, 55, 56, 62, and 65, contain at least one of the limitations discussed in the above findings and are not infringed by the A J-A2 control.
JEC-25 INFRINGEMENT ISSUE
72. As noted in finding 45, plaintiffs urged at the trial that claims 3, 8, 12, 38, and 45 of the '902 patent are infringed by the JFC-25 control. Claim 3 of the '902 patent recites means responsive to engine induction air pressure and temperature. The induction air pressure and the induction air temperature are sensed at the same location in the '902 device in order to allow measurement of the air density. This is essential in a piston type engine in order that the mass air flow can be determined and fuel proportioned to provide the required fuel-air ratio. In the JFC-25 control pressure is sensed at the discharge of the compressor and temperature is sensed at the inlet to the compressor. Neither of these sensors, the compressor pressure limiter nor the compressor inlet pressure sensor, responds to induction air pressure or temperature, and they cannot be combined to measure air density, nor is it possible to measure air density by any other means provided on the JFC-25. Also, the JFC-25 control does not maintain the fuel flow proportional to the air flow.
73. A number of the '902 claims recite means responsive to atmospheric or barometric pressure. Claim 9 of the '902 patent recites “means * * * to vary said engine fuel supply with changes of * * * surrounding atmospheric pressure.” *886 This component of the '902 patent disclosure has no counterpart in the JFC-25 control. Although it has been correlated by plaintiffs with the compressor pressure limiter or compressor inlet pressure sensing bellows of the JFC-25, there is a clear distinction between the operation of these assemblies. Moreover, neither the compressor pressure limiter nor the compressor inlet pressure sensing bellows of the JFC-25 operates during the acceleration and deceleration regimes. There is no infringement by the JFC-25 of claims 3 or 9 or any of the following claims of the '902 patent, all of which contain similar limitations to those discussed in connection with claims 3 and 9 above: Claims 1, 2, 4, 5, 8, 9, 12, 24, 25, 36, 38, 41, 43, 45, 46, 48, 51, 54, 55, 56, 61, 62, or 65.
74. Claim 38 of the '902 patent recites speed responsive centrifugal means adapted to he dri/oen from the engine for metering the engine fuel supply in accordance with engine speed. This means of the '902 control, which comprises flyweights 148, has been equated by plaintiffs with the speed sensing governor of the JFC-25. The two components while similar in structure perform significantly different functions. The '902 flyweight device responds to variations in engine speed and operates to vary the fuel-air ratio; whereas, the JFC-25 speed governor controls engine speed and does not control fuel-air ratio. There is no infringement by the JFC-25 of claim 38 of the '902 patent or the following claims which are similarly limited to the speed responsive means discussed above: Claims 1, 2, 4, 5, 8, 9,12, 24, 36, 41, 43, 45, 46, 48, 51, 54, 55, 56, 61, 62, and 65.
75. Claim 21 of the '902 patent prescribes a/n engine driven pump adapted to supply a definite guantity of fuel for each revolution of the engine. In the charge of infringement, plaintiffs have alleged that the '902 pump and the pump employed in the JFC-25 are equivalents. As noted in finding 66, the evidence does not support this conclusion. The '902 pump is engine driven so as to produce an output which varies with engine speed and is the primary means used to control fuel flow. In contradistinction, the JFC-25 pump speed is not related to the amount of fuel delivered to the engine. Fuel flow in the JFC-25 is controlled by the throt- *887 tie valve and pressure regulating valve located downstream from the pump. Neither claim 21, nor claims 36, 38, 43, 45, 46, 47, 48, 51, 54, 55, 56, 61, 62, or 65 of the '902 patent, all of which also contain a “pump” recital, are infringed by the JFC-25 control.
•76. A number of the '902 claims, including claims 3, 24, 25, 41, 45, 46, 47, 48, 51, 54, 55, 56, and 65 recite a manual control means, lever 78 in the construction illustrated. Claim 65 of the '902 patent recites manually actuated, means for varying the fuel flow independently of the altitude and engine speed. None of these claims of the '902 patent are infringed by the JFC-25 for the reasons discussed in findings 67 and 70 above.
VS-2 INFRINGEMENT ISSUE
77. As noted in finding 45, plaintiffs have urged that claims 45, 51, 54, 55, 56, and 65 of the '902 patent are infringed by the VS-2 control. Claim 45 recites barometric pressure responswe means for altering the engine fuel supply with changes of altitude. The VS-2 control does not possess a means for the measurement of barometric or atmospheric pressure. The component of the VS-2 control which plaintiffs correlate with the '902 barometric pressure responsive means, the VS-2 compressor discharge bellows, is subject to the discharge pressure of the compressor or burner pressure, and as was noted in finding 64, this pressure may vary widely at a given altitude and may be the same at two widely different altitudes, which could not be possible were it responsive to atmospheric pressure. Claim 45 also provides for speed responswe governor means for regulating the engine fuel supply with changes of engine speed. The '902 speed responsive governor means is, as has been previously noted, limited to an enrichment device, as distinguished from the governor flyweights of the VS-2 which control engine speed. The speed responsive means of the '902 in no way controls engine speed. Also, the speed governor of the VS-2 control does not operate during the acceleration regime. Each of the remaining claims asserted against the VS-2, claims 46, 51, 54, 55, 56, and 65 possess limitations similar to those discussed in connection with *888 claim 45 above. None of these claims of the '902 patent are infringed by the VS-2 control.
MFC — 2 INFRINGEMENT ISSUE
78. As noted hi finding 45, plaintiffs urged at trial that claims 3, 8, and 45 of '902 patent are infringed by the MFC-2 control. Claim 8 recites pressure and temperature responsive means connected with said manifold. As has been previously noted, the pressure and temperature responsive means referred to in the '902 claims are arranged to measure air density. The MFC-2 control does not measure air density. The MFC-2 senses air inlet temperature and compressor discharge pressure, which plaintiffs correlate with the two measurements of the '902 device described in the portion of the claim above quoted. These measurements sensed by the MFC-2 are not used to measure air density. The purpose of the temperature and pressure measurements made by the MFC-2 is to avoid compressor stall and to compensate for governor droop, problems peculiar to jet aircraft engines and not a concern with piston-type aircraft engines for which the '902 control was designed. Similar structure to that quoted above from claim 8 is prescribed in claims 1, 2, 3, 25, 36, 45, 46, 48, 51, 54, 55, 56, and 65 of the '902 patent. There is no infringement of any of these claims by the MFC-2 control.
79. Claim 45 of the '902 patent recites speed responsive governor means for regulating the engine fuel supply with changes of engine speed. As noted previously, the speed responsive governor means of the '902 patent is an enrichment control only, and does not operate as a true governor in that it does not control engine speed. The component of the MFC-2 control with which it is equated by plaintiffs, the flyweights, does control engine speed. The MFC-2 control does not infringe claim 45 or any of the other '902 claims which specify the use of speed responsive means or means responsive to engine operating conditions, including claims 1, 2, 3, 8, 36, 46, 47, 48, 51, 54, 55, 56, and 65. A number of the '902 claims the MFC-2 is charged to infringe recite a manual control means. For example, claim 45 re *889 cites operatively interconnected manual and automatic means for controlling the engine fuel supply; said automatic means i/ncl/uding speed responsive governor means for regulating the engine fuel supply with changes of engine speed. In the '902 control, either the manual or automatic control, but not both, is in effect at any given time, while the automatic and manual means are both in effect at all times in the MFC-2 control to establish the selected engine speed. Neither claim 25, nor any of the other claims including claims 3, 25, 46, 47, 48, 51, 54, 55, 56, and 65, which have a similar manual control limitation are infringed by the MFC-2 control.
80. The accused MFC-2 fuel controls were manufactured as a joint effort of the General Electric Company and plaintiff Chandler-Evans Corporation. The initial phases of manufacture were performed by General Electric, who shipped the MFC-2 controls in incomplete form, to the Chandler-Evans Corporation for additional phases of their manufacture. Chandler-Evans was responsible for making production and engineering tests which included testing, adjusting, calibrating and replacing procedures. This work performed on the MFC-2 controls by plaintiff Chandler-Evans Corporation represented a substantial portion of the work required in the production of the MFC-2 controls, constituted acts of manufacture, and resulted in implied licensing of said controls under any patent rights Chandler-Evans possessed. As a result of this license, defendant is not liable for the use of the MFC-2 controls, even should it be found that the said controls infringe any of the '902 patent claims.
IEC INFRINGEMENT ISSUE
,81. Plaintiffs at trial did not present sufficient evidence to substantiate their charge of infringement by the IEC integrated electronic control. The following observations are made concerning plaintiffs’ charge of infringement of eight claims of the '902 patent. As noted in finding 45, plaintiffs urged at the trial that claims 63 and 71 of the '902 patent are infringed by the IEC control.
82. Claim 63 of the '902 patent calls for speed responsive means, as do claims 45, 48, 49, 64, 67, and 71. Plaintiff has *890 alleged tbe speed responsive means referred to in tbe '902 claims corresponds to tbe tachometer portion of the ampli-dyne-tacbometer of the IEC control. Tbe tachometer of tbe IEC does not function during tbe acceleration regime, the only stage in which infringement is charged. There is no infringement of any of these 7 claims of the '902 patent by the IEC electronic control.
S3. Claim 25 of the '902 patent, the only remaining claim asserted against the IEC recites means automatically opera-ti/oe in response to variations in pressure and temperature of the air flowing through said passage for varying the fuel supply. As has been previously noted, this arrangement in the '902 control is for the measurement of air density. There is no counterpart in the IEC control. Similar structure is recited in claims 45, 48, 49, 63, and 67. There is no infringement of claims 25, 45, 48, 49, 63, or 67 of the '902 patent by the IEC electronic control.
84. Claims 25 and 64 of the '902 patent recite a manual means which is sometimes rendered substantially ineffecti/oe. In the IEC control, the manual means is never rendered ineffective. The IEC electronic control does not infringe either claim 25 or 64 of the '902 patent.
85. A number of the '902 patent claims, including 45, 48, 49, 63, 64, 67, and 71, asserted against the IEC recite a fuel pump or an engine driven fuel pump. These claims are not infringed by the IEC electronic control for the reasons discussed in finding 66.
<86. Defendant has urged that the disclosures of a number of prior patents, including the patents to Wunsch 2,341,257, Simmen 1,975,624, Heinzelmann 2,179,628, and Jung 2,306,-953, recited in finding 88, require that the '902 claims, if valid, be narrowly construed to be distinguished over these patents. When the '902 claims in suit are considered in the light of these prior patents, there can be no infringement by the accused controls.
87. Summarizing findings 62 through 86, it is concluded that none of the several claims of the '902 patent relied upon by plaintiffs are infringed by the manufacture, use, or sale of the AJ-A2, JEC-25, VS-2, MFC-2, or the IEC controls.
*891 KEGGIO 2,435,902 INVALID
88. Defendant has urged that the claims of the '902 patent in suit are invalid for lack of novelty and lack of patentable advance or in the alternative must be so limited as not to be infringed in view of the following prior patents:
Esnault-Pelterie- 1,312,899 Aug. 12, 1919
Riege_ 1,467,333 Sept. 11, 1923
Hillhouse_ 1,483,883 Feb. 19, 1924
Davol_ 1,683,671 May 4,1926
Simmen_ 1,975,624 Oct. 2, 1934
Dodson_ 2,031,527 Feb. 18, 1936
Lauret_ 2,034,144 Mar. 17, 1936
Alden_ 2,156,933 May 2, 1939
Muselier_ 2,177,908 Oct. 31,1939
Heinzelmann_ 2,179,628 Nov. 14, 1939
Heinzelmann_ 2,180,108 Nov. 14, 1939
Banning_ 2,213,683 Sept. 3,1940
Scbweizer_ 2,213,997 Sept. 10,1940
Jung_ 2,219,994 Oct. 29,1940
Chandler_ 2.224.472 Dee. 10, 1940
Becker_ 2,244,669 June 10, 1941
Neugebauer_ 2,261,856 Nov. 4, 1941
Udale_ 2,264,347 Dec. 2, 1941
Pescara_ 2,292,288 Aug. 4, 1942
Gosslau_ 2,297,213 Sept. 29,1942
Jung_ 2,306,953 Dee. 29, 1942
Wunsch_ 2,341,257 Feb. 8,1944
Reggio_ 2,378,036 June 12, 1945
Mock_ 2,390,658 Dec. 11, 1945
Mock_ 2,426,153 Aug. 19, 1947
Mock_ 2,447,261 Aug. 17, 1948
British Saurer_ 482,864 Apr. 6, 1938
French Bateau_ 801,587 Aug. 7, 1936
89. None of the patents listed in finding 88 were cited by the examiner during the prosecution of the '902 application in the U.S. Patent Office. These patents relied upon by defendant disclose all of the essential features of the '902 claims in suit. Of these patents, Reggio 2,378,036, Chandler 2,224,472, Wunsch 2,341,257, and Pescara 2,292,288 are considered the most pertinent. The remaining patents are cumulative in nature.
*892 90. Wunsch patent 2,341,257, which, issued on an application filed Dec. 5,1938, and which mentions a foreign filing date of Dec. 1, 1937, discloses a fuel feeding device for internal combustion aircraft engines which includes the following elements, the counterparts of which may be found in the '902 control and which collectively operate in substantially the same way as the corresponding '902 elements: An engine driven fuel pump, fuel control means, pressure and temperature responsive means, a connecting means between the fuel control means and the pressure and temperature responsive means, valve means for regulating the engine fuel flow, cam means, and operatively interconnected manual control means and speed responsive governor means comprising engine driven centrifugal flyballs for varying the mixture richness. Some of the '902 claims in suit, such as claim 12, also call for a servo-motor means for actuating the fuel control means. It would have been obvious to use a servo-motor to move the fuel control valve of the Wunsch device.
91. The record shows that prior to the filing of the present suits, Mr. Prentiss, patent counsel for plaintiff Chandler-Evans Corp. and Mr. Chandler, an inventor in the fuel control field, both witnesses called by plaintiffs, once regarded the Eeggio patents in suit as being either extremely limited in scope or invalid in view of the prior art, particularly the Wunsch patent 2,341,257. For example, Mr. Chandler wrote in a memorandum of December 10,1954, with regard to the two patents in suit:
I am inclined to think that these are all paper patents, handled by a very clever lawyer, and the probability of their being sustained in view of the prior art is very remote.
Later, Mr. Prentiss in a letter to Eeggio dated August 8,1955, stated:
In our search of the prior art, incident to our study of the claims of your patents No. 2,673,556 and No. 2,435,-902, we discovered the patent to Wunsch, No. 2,341,257 which we believe anticipates a substantial number of the claims of both of your said patents, and also has a narrowing effect upon the interpretation of all of the claims of these patents.
*893 Also, in a memorandum dated March 8, 1955, Mr. Prentiss made the following statement:
Thus, claims 45, 46, 51, 55, 56, 59, and 65 of Eeggio 2,435,902 appear to be directly readable on Wunsch (Figures 6, 7, and 8) and, in my opinion, are anticipated by this reference.
92. Chandler patent 2,224,472, which issued on an application filed May 2, 1938, discloses a fuel control which includes the following components operatively associated in substantially the same manner as are the corresponding elements of the '902 control: An engine driven fuel pump, a control means for variably regulating the quantity of fuel supplied by the pump to the engine, fuel-air ratio control means, pressure and temperature responsive means (including two pressure responsive means as prescribed by such claims as claim 38), speed responsive means, and manual means for varying the mixture richness. As previously stated, the speed responsive means of certain of the claims of the '902 patent are frequently designated as a governor. Such structure is not employed in the Chandler control which measures changes in engine speed by means of a diaphragm responsive to Venturi airflow. It would have been an Obvious expedient to modify the Chandler speed responsive control by substituting a fly ball governor.
,93. Pescara patent 2,292,288, which issued on an application filed May 31, 1938, and which mentions a foreign filing date of June 2, 1937, relates to a device which is designed in part to regulate the amount of fuel delivered to the propulsion system of an aircraft. The Pescara device includes the following coacting elements which fit the description of combinations of components recited in the '902 claims in suit, particularly claim 63: A combustion chamber, passages connected to the combustion chamber for leading air thereto and combustion products therefrom, an engine driven fuel pump, means for controlling the fuel flow to the combustion chamber including pressure responsive means in the air passage, temperature responsive means in the exhaust passage, speed responsive means, and manual control means.
94. Reggio patent 2,378,036, which issued June 12, 1945, on an application filed July 7, 1941, and which is a con- *894 tiimation in part of parent application Ser. No. 254,355 filed February 3,1939, is described in finding 26, and discussed in findings 27 through 30. The '036 patent discloses substantially all of the features of the '902 patent claims in suit.
.95. Defendant has applied the terminology of each of the '902 claims in suit to various of the prior patents relied upon in a series of colored charts identified as defendant’s exhibits 64,66-70,72-75, and 81-100, incorporated herein by reference only.
96. Summarizing, all of the 31 claims of the '902 patent in suit are invalid in view of the prior art patents listed in finding 88 and discussed in part in findings 89-95 and in the exhibits noted in finding 95.
97. A number of the claims of the '902 patent in suit are vague, ambiguous, indefinite, and aggregative. They generally comprise a cataloging of various means or parts without delineating with the requisite particularity the proper relationship or association of the various parts with one another. Title 35 U.S.C. § 112states:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
The '902 patent claims in suit are invalid on the ground of being indefinite or aggregative.
98. Defendant has urged as an additional defense that the '902 patent is invalid for claiming the same invention claimed in the earlier issued Eeggio patent 2,378,036. Claim 7 of the '902 patent, a claim originally in suit but which was subsequently withdrawn, defines the same subject matter as claim 7 of the '036 patent. The record does not clearly support defendant’s allegation that the counterparts of other '902 claims including 1, 2, 3, 4, 5, 8, and 71 can be found among the claims of the '036 patent. It is found that claim 7 of the Eeggio '902 patent extends the monopoly defined in claim 7 of the earlier issued Eeggio 2,378,036 patent.
OTHER DEEENSES
99. Defendant has urged as a defense that plaintiffs Pratt and Whitney and Chandler-Evans do not have a right of *895 action with the patentee, Keggio, under 28 U.S.C. 1498. This question was resolved by the court in Pratt and Whitney Company, Incorporated, and Ferdinando Carlo Reggio v. United States, 139 Ct. Cl. 540, 153 F. Supp. 409 (1957), and need not be considered here.
100. Defendant has also contended that it was in possession of an implied license from plaintiffs, Pratt and Whitney and Chandler-Evans, to utilize the subject matter covered by the claims of the two patents here in suit. This position is based at least in part upon the allegation that plaintiffs’ predecessor in interest, the Niles-Bement-Pond Co., purchased the exclusive rights to these patents in the aircraft field as a result of knowledge obtained through a confidential relationship with defendant, and that these plaintiffs are therefore prohibited from asserting a claim against defendant. The testimony and evidence do not warrant a finding that there was such a license.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1-22, 33, and 34 of U.S. Letters Patent 2,673,556 'and claims 1, 2, 3, 4, 5, 8, 9, 12, 21, 24, 25, 36, 38, 41, 43, 45, 46, 47, 48, 49, 51, 54, 55, 56, 61, 62, 63, 64, 65, 67, and 71 of U.S. Letters Patent 2,435,902, all of the claims here in suit, are invalid and not infringed, and the petitions are dismissed.

 Reference numerals in parentheses are reference numerals for the corresponding elements in the Reggio '556 patent in suit.

 Italicized words correspond to elements of the AJ-A2 as shown and designated in plaintiffs' exhibit 10.

 Italicized words correspond to elements of JFC-25 as shown in the drawing from plaintiffs’ exhibit 7.

 Italicized words correspond with designation of elements in drawing from plaintiffs’ exhibit 16.

 Paragraph references are to plaintiff’s exhibit 21.